[886 NYS2d 133]

GULF INSURANCE COMPANY, Appellant, v TRANSATLANTIC REIN-
SURANCE COMPANY et al., Defendants, and GERLING GLOBAL
REINSURANCE CORPORATION OF AMERICA, Respondent. (And
Another Action.)

First Department, October 1, 2009

## APPEARANCES OF COUNSEL

*Simpson Thacher & Bartlett LLP*, New York City (*Mary Kay Vyskocil, Jonathan K. Youngwood* and *Michael C. Ledley* of counsel), for appellant.

*Pitchford Semerdjian LLP*, New York City (*David L. Pitchford* and *Sylvia Semerdjian* of counsel), for respondent.

## OPINION OF THE COURT

McGuire, J.

This appeal requires us to resolve numerous disputes arising from litigation between Gulf Insurance Company and Gerling Global Reinsurance Corporation of America concerning a series of "quota share" treaties between Gulf on the one hand and Gerling and other reinsurers on the other, and a series of separate agreements, "Interests and Liabilities Contracts" (I&L contracts), between Gulf and each of the reinsurers individually, pursuant to which the reinsurers agreed to reinsure a portion of Gulf's losses under a portfolio of automobile residual value insurance (RVI) that Gulf began issuing in 1996 to various policyholders, including nonparty First Union Corporation. The participating reinsurers in "quota share" reinsurance treaties agree in each treaty year to accept a specified percentage of the cedent's covered losses in that year, and to receive in return the same percentage of the premiums paid to the cedent from all the policyholders in the particular "book" of business (*see* Ostrager and Vyskocil, Modern Reinsurance Law and Practice § 2.01 [a], [b] [2d ed 2000]; *see also Christiania Gen. Ins. Corp. of N.Y. v Great Am. Ins. Co.*, 979 F2d 268, 271 [2d Cir 1992] ["Treaty reinsurance obligates the reinsurer to accept in advance a portion of certain types of risks that the ceding company underwrites"]). Facultative reinsurance, by contrast, "is reinsurance that is purchased for a specific risk insured by the cedent" (Ostrager and Vyskocil § 2.01 [b]; *see also Christiania*, 979 F2d at 271 ["Facultative reinsurance covers only a particular risk or a portion of it, which the reinsurer is free to accept or not"]).

In March 2000, First Union brought a coverage action against Gulf in North Carolina and ultimately claimed that Gulf owed it $418 million in RVI losses under the First Union policy. In February 2003, Gulf and First Union agreed to settle the litigation

for $266 million. The next month, Gulf submitted a bill to the applicable reinsurers, a group that did not include Gerling, for the treaty years 1996 through 1998. The reinsurers refused to pay and Gulf initiated this action to collect the reinsurance protection to which it contended it was entitled. In March 2004, Gulf submitted a second billing to the applicable reinsurers for later treaty years, including 1999; Gerling was among this group of reinsurers. Gerling also refused to pay and commenced a separate action against Gulf that was consolidated for pretrial purposes with the action commenced by Gulf.

In its complaint, Gerling seeks to rescind the three treaties it concededly participated in, the 1999, 2000 and 2001 treaties, on the basis of alleged nondisclosures and misrepresentations that it claimed Gulf either made or for which it was responsible. In addition, Gerling contends in its sixth cause of action that although Gulf had billed losses to Gerling as if it were a participant in the 1998 treaty, no agreement exists between Gerling and Gulf with respect to the 1998 treaty. Thereafter, Gulf amended its complaint to include Gerling as a defendant and alleged, among other things, in the first cause of action of its second amended complaint, that Gerling had breached its indemnification obligations under the 1999 treaty by failing to pay some $789,820, its alleged share of the First Union settlement. In addition, in its answer in the action commenced by Gerling, Gulf brought this same claim as its first counterclaim; Gulf's fifth counterclaim, also for breach of contract, asserted that Gerling had failed to pay over $31,775,000, representing Gerling's alleged share of losses under the 1998, 1999, 2000 and 2001 treaties relating to RVI policies other than the First Union policy. As discussed below, moreover, Gulf also asserted, in the alternative, two counterclaims for reformation of certain of the I&L contracts.

Following discovery, Gulf moved for partial summary judgment on its first cause of action against Gerling and other of the reinsurers. Gerling also moved for partial summary judgment in both actions and, insofar as is relevant to this appeal, sought a declaration that no agreement existed between Gulf and Gerling with respect to the 1998 treaty, a declaration concerning the extent of Gerling's participation in the 1999 and 2000 treaties, a declaration that the First Union policy is not covered by the 1999 treaty and dismissal of Gulf's second amended complaint. In addition, Gerling sought summary judgment dismissing Gulf's counterclaims for reformation. Eventu-

ally, Gulf settled with all reinsurers other than Gerling. As discussed below, Supreme Court denied Gulf's motion and granted Gerling's. Gulf appeals from the order denying its motion and granting Gerling's.

One of the disputes between the parties concerns the extent of the participation by Gerling in the risks it reinsured under the treaties for 1999 and 2000 and the accompanying I&L contracts. That dispute turns on whether Gerling's participation is stated as a percentage of the risk assumed by all the reinsurers collectively or as a percentage of all the risk assumed by Gulf under its RVI book. As elucidating this dispute will help explain the other disputes, we begin with it.

## A

Under the 1999 treaty—the relevant language of the 2000 treaty is identical—the reinsurance coverage is divided into "Section A" and "Section B," with the former covering Gulf's liabilities to its policyholders under all but one of the RVI policies and the latter covering its liabilities to nonparty General Electric Capital Auto Financing Services, Inc. The "Business Covered" section of the treaty provides with respect to section A that "[t]he Company [Gulf] shall cede to the Reinsurer [a term defined to include all participating reinsurers collectively] and the Reinsurer shall accept from the Company a 45% quota share participation of the net retained insurance liability of the Company on each risk insured." With respect to section B, the relevant language is identical except that it provides for a 65% quota share participation. The term "net retained insurance liability" is defined as "the remaining portion of the Company's gross liability on each risk reinsured under this Agreement after deducting recoveries from all reinsurance, other than the reinsurance provided hereunder and the reinsurance provided in the Company Retention Article." With respect to section A, the treaty states in article VII, "Company Retention," that "[t]he Company will maintain for its own net account a 55% participation in the business reinsured hereunder. However, at its discretion, the Company may purchase facultative reinsurance." With respect to section B, the language in article VII is identical except that a 35% participation is specified.

The last clause of the definition of "net retained insurance liability" is problematic.[1] In its brief, Gerling states that the term is defined "as Gulf's 'gross liability on each risk reinsured . . . after deducting recoveries from all [other] reinsurance.'" Gerling thus states—Gulf expresses no disagreement—that recoveries from any facultative reinsurance Gulf purchased but not recoveries from the reinsurance provided under the treaty are deducted from Gulf's gross liability of 100% to determine Gulf's "net retained insurance liability." In computing Gulf's "net retained insurance liability" it makes sense not to deduct from Gulf's gross liability the amount of the recoveries from the reinsurance provided under the treaty, because the amount of those recoveries is itself a function of Gulf's "net retained insurance liability." Read literally, however, the last clause of the definition also would require that Gulf's gross liability not be reduced by recoveries from any facultative reinsurance Gulf purchased in accordance with its discretionary authority under article VII. As the parties appear to agree that a portion of the last clause of the definition—i.e., the phrase "and the reinsurance provided in the Company Retention Article"—should be read out of the treaty, we follow the course they have charted (see *Mitchell v New York Hosp.*, 61 NY2d 208, 214 [1984]).

Because Gulf's gross liability of 100% is reduced to the extent it secures facultative reinsurance, it follows that its "net retained insurance liability" is not necessarily a constant over the life of the treaty. For the same reason, although the quota share ceded to the reinsurer for the two sections is fixed at 45% and 65%, those percentages also are not necessarily constant over the life of the treaty when expressed as a percentage of Gulf's total exposure for each section under its RVI book.

---

**1.** Although the definition contemplates that reinsurance other than facultative reinsurance and the reinsurance provided under the treaty was available to Gulf so as to reduce its gross liability, the nature of that other reinsurance is not stated in the definition. However, the definition of the term "original gross net written premium," which presumably is intended to be in balance with the definition of "net retained insurance liability," states that the term "shall be defined as gross written premium less returns, cancellations, inuring excess of *loss reinsurance* and facultative reinsurance, if any" (emphasis added). Apart from facultative reinsurance, the parties do not mention the subject of any other form of reinsurance, and so we need not be concerned with it. We note as well that the word "recoveries" in the definition of "net retained insurance liability" suggests that gross liability is reduced not by the extent of the risk assumed under any other reinsurance but only to the extent that the reinsurer makes good on the risk it assumes and actually indemnifies Gulf for a particular loss. The parties, however, do not so contend or make any hay of the word "recoveries."

Gulf, however, relies on extrinsic evidence—i.e., that it never exercised its right to purchase facultative reinsurance. Gerling does not object to or dispute this extrinsic evidence, perhaps because it relies on it as well and contends that the absence of any facultative reinsurance supports its position. In any event, Gulf stresses that it is undisputed that it never obtained any reinsurance for its RVI book other than that provided under each treaty, and thus that its "net retained insurance liability" was at all times equal to its "gross liability" of 100%. Accordingly, it argues with respect to section A—the analysis is the same with respect to section B—that "[i]t follows per force [sic] that the portion of Gulf's 'net retained insurance liability' ceded to the quota share reinsurers collectively was 45% of its 'gross liability' of 100%." Gulf further maintains that this conclusion is reinforced by the provision in article VII, the "Company Retention Article," stating, with respect to section A, that "[t]he Company will maintain for its own net account a 55% participation in the business reinsured hereunder." Again, the analysis is the same with respect to section B, as article VII goes on to provide that Gulf will maintain for its own net account a 35% participation.

Gulf then points to its I&L contract with Gerling for 1999, which states that Gerling "shall have a 6.50% participation as respects Section A and a 26.50% participation as respects Section B in the Interests and Liabilities of the Reinsurer as set forth in the agreement attached hereto entitled Quota Share Reinsurance Agreement." According to Gulf, the treaty defines the participation of the reinsurers collectively as a percentage of Gulf's total risk of loss under the RVI book, and thus it contends that "Gerling's individual participation therein necessarily also reflects a percentage in Gulf's total risk of loss."[2] Gulf buttresses this conclusion with additional evidence (as discussed below, it also is extrinsic evidence) by pointing to the I&L contracts with the other reinsurers and asserting that "when all of the reinsurers' individual participations under their I&L contracts are added up (TRC 12.5%; XL 11.25%; Odyssey 11.25%; and Gerling 10%), they total the 45% share of Gulf's

---

**2.** This argument proves too little. The question is not whether Gerling's participation reflects *a* percentage in Gulf's total risk of loss—it clearly does—but what that percentage is of Gulf's total risk of loss. Specifically, with respect to section A liabilities for 1999, the question is whether Gerling's participation is 6.5% of Gulf's 100% total risk of loss or 2.925% (6.5% of 45%) of that 100% risk.

gross liabilities that the . . . reinsurers agreed collectively to accept under the [treaty]."[3]

Finally, Gulf relies on other extrinsic evidence, including, most significantly, testimony that for each treaty year Gerling and other reinsurers received premiums from Gulf that matched the premiums that would be due if the stated percentage participation of each reinsurer were a percentage of Gulf's 100% total risk. Thus, for example, with respect to section A liabilities for 1999, Gerling received 6.5% of all the premiums Gulf received from its policyholders. For its part, Gerling does not deny that it received a premium that significantly exceeded the amount that would be due to it under its construction of the treaties and I&L contracts. Rather, it offers an explanation. As Supreme Court stated in apparently accepting that explanation, "Gerling explains that its acceptance of the [higher amounts of premium] was based upon its mistaken acceptance of the broker's representations to its bookkeeping department that the amounts were correct." (2007 NY Slip Op 33773[U], *13.) In addition, Gerling maintains that because the premium was received after, not contemporaneously with, execution of the contract documents, its receipt and related documents of its bookkeepers "do not reflect any interpretation of treaty wordings."[4]

Gerling's arguments also focus for illustrative purposes on section A under the 1999 treaty and I&L contract. Gerling's

---

**3.** In support of this assertion Gulf does not cite to the I&L contracts with the other reinsurers, and the parties appear not to have included copies of the I&L contracts with the other reinsurers in the voluminous record on appeal. Rather, Gulf cites to deposition testimony from representatives of each of the other reinsurers regarding their participation in section A for 1999; the percentage figures quoted above by Gulf apparently reflect section A participation in 2000, when Gerling increased its share from 6.5% to 10%. However, Gerling does not take issue with this assertion and the parties apparently agree that for all relevant treaty years the sum of the individual participations specified in the I&L contracts for each section equals the applicable quota share percentage of the net retained insurance liability that was ceded collectively to the reinsurer.

**4.** Although the receipt of the premium under the 1999 treaty and I&L contract occurred after their execution, the receipt of that premium preceded the execution of the 2000 treaty and I&L contract, which in relevant part are identically worded. Thus, if the relevant contractual language were ambiguous, the payment and receipt of the premium in amounts consistent only with Gerling's stated participation being a percentage of Gulf's total exposure for its RVI business would be relevant. In any event, the course-of-performance evidence Gulf relies upon is critical to the next issue we discuss, whether Supreme Court erred in granting summary judgment to Gerling dismissing Gulf's counterclaims for reformation.

argument, however, stresses that the I&L contract unequivocally states that "[Gulf] shall pay [Gerling] 6.50% of all premiums due . . . the Reinsurer in accordance with the provisions of the Agreement [the treaty] attached." The treaty states that "[Gulf] shall pay to the Reinsurer 45% of [Gulf's] original gross net written premium . . . in respect to its net retained insurance liability." As noted above, the treaty defines "original gross net written premium" as "gross written premium less returns, cancellations, inuring excess of loss reinsurance and facultative reinsurance, if any." Gerling goes on to argue that Gulf's "original gross net written premium" is "simply put—the 100% of policy premiums from which it pays the reinsurers their 45% portion." The truth of that statement depends on extrinsic matters, including whether Gulf exercised its right to purchase facultative reinsurance; Gerling immediately goes on to state, citing to Gulf's brief, that Gulf obtained no other reinsurance.

Although extrinsic proof is necessary to determine whether Gulf's "gross written premium" equals its "original gross net written premium," Gerling's reliance on extrinsic evidence in this regard is inconsequential. After all, the provision of the I&L contract specifying that Gerling is entitled to 6.5% of all premiums *"due . . . the Reinsurer"* is consistent with Gulf's position that Gerling assumed 6.5% of Gulf's "net retained insurance liability"—which happens here to equal Gulf's "gross liability" of 100%—only if the reinsurer is entitled under the treaty to 100% of Gulf's "original gross net written premium." Obviously, the reinsurer is entitled to far less, the specified 45% of Gulf's "original gross net written premium." In short, the language of these provisions unambiguously supports Gerling's position.

Gerling also relies on equally unambiguous language in the 1999 I&L contract specifying its share of section A liabilities. Consistent with the provisions specifying Gerling's share of premiums, it states that "[Gerling] shall have a 6.50% participation . . . in the Interests and Liabilities of the Reinsurer as set forth in the Agreement attached hereto entitled Quota Share Reinsurance Agreement." The treaty provides that "Gulf shall cede to the Reinsurer and the Reinsurer shall accept from [Gulf] a 45% quota share participation of [Gulf's] net retained insurance liability . . . on each risk insured." Accordingly, reading both documents together, Gerling has a 6.5% participation in the 45% quota share of Gulf's net retained insurance liability.

Again, the fact that it cannot be determined from the four corners of both documents whether Gulf's net retained insurance liability is equal to or less than 100% of Gulf's gross liability of 100% is irrelevant. The crucial and unambiguous fact is that Gerling has a 6.5% participation in the 45% quota share and that quota share cannot be equal to 100% of Gulf's net retained insurance liability.

In any event, the extrinsic proof that Gulf relies on, however powerful it may be, is irrelevant for it cannot be admitted to vary the unambiguous language of each I&L contract and its accompanying treaty (*see Greenfield v Philles Records*, 98 NY2d 562, 569-570 [2002]). It may be, the point need not be decided, that the relevant language of each I&L contract between Gulf and Gerling and its accompanying treaty might be rendered ambiguous if each of these sets of agreements could be read in conjunction with the other I&L contracts for each treaty year. Gulf correctly argues that each of its I&L contracts with Gerling must be read with the applicable treaty as a single agreement as the I&L contract and treaty for each year form part of a single transaction (*Nau v Vulcan Rail & Constr. Co.*, 286 NY 188, 197 [1941] ["All three instruments were executed at substantially the same time, related to the same subject-matter, were contemporaneous writings and must be read together as one"]; *see also This Is Me, Inc. v Taylor*, 157 F3d 139, 143 [2d Cir 1998] [same, construing New York law]). But Gulf cites to nothing in the record to support the proposition that for each year the treaty and the I&L contracts with all the reinsurers, regardless of when each I&L contract was executed, can be regarded as a single transaction. Indeed, Gulf does not so contend and advances only the correct and more modest argument that each of its I&L contracts with Gerling must be read together with the accompanying treaty. Thus, we have neither the occasion to determine nor an adequate factual basis for determining the applicability of authority holding "that all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, *even though they were executed on different dates and were not all between the same parties*" (*This Is Me*, 157 F3d at 143 [emphasis added]).

As it also depends on the same extrinsic evidence concerning the terms of its I&L contracts with the other reinsurers, Gulf's reliance on the Company Retention provision of the treaties is misplaced. Moreover, Gulf simply assumes both that the per-

centage participation specified in the Company Retention provision is a maximum participation and that it did not breach its obligation to retain no more than the specified percentage participation. By contrast, Gerling cites to treatises (see Jean F. Webb, *The Pro Rata Property Treaty*, in Reinsurance, at 34 [Robert W. Strain rev ed 1997]; Walter J. Coleman, *The Pro Rata Treaty in Property Insurance*, in Reinsurance, at 143 [Robert W. Strain ed 1980]) in support of its position that the specified percentage participation is a minimum participation (albeit one that Gulf can reduce to the extent it exercises its discretionary authority to purchase facultative reinsurance). Although we need not decide the point, we note that in its reply brief Gulf does not address Gerling's argument that the specified retention is a minimum participation.

In sum, Supreme Court correctly concluded that the relevant provisions of the 1999 and 2000 treaties and I&L contracts unambiguously state Gerling's percentage participation as a percentage of all risk assumed by the reinsurers.

## B

Gulf hedged its position that under the treaties and I&L contracts the percentage participation of Gerling stated in each I&L contract is a percentage of all of Gulf's exposure under the applicable section. That is, as noted earlier, Gulf asserted, in the alternative, two counterclaims for reformation, one relating to reinsurance of losses under the First Union policy and the other relating to reinsurance of losses under Gulf's other RVI policies. Gulf alleged that the mutual intent of the parties with respect to each treaty and I&L contract was that the percentage participation of Gulf stated in each I&L contract was a percentage of all of Gulf's losses under the applicable section, not a percentage of the applicable quota share (the portion of Gulf's total exposure ceded collectively to the reinsurer). Accordingly, Gulf claimed that to the extent the language of the I&L contracts could be interpreted to state Gerling's percentage participation as a percentage of the applicable quota share, the language reflected a mutual mistake requiring reformation of the I&L contracts "to make clear that Gerling agreed to reinsure Gulf for its agreed upon share of 100% of *all* losses under Gulf's" RVI book.

Supreme Court granted summary judgment to Gerling dismissing Gulf's counterclaims for reformation. Contending that its submission in opposition to Gerling's motion raised ma-

terial issues of fact that require a trial, Gulf argues that Supreme Court erred. We agree that summary judgment dismissing Gulf's reformation counterclaims should not have been granted. As discussed below, the course-of-performance evidence and the other evidence Gulf relied on constitute unequivocal and persuasive evidence of mutual mistake.

In *Chimart Assoc. v Paul* (66 NY2d 570 [1986]), although a letter agreement signed by a businessman, David Paul, unequivocally obligated him both to make a guarantee payment to Chimart Associates and to pay interest on a late payment, Paul contended that he was required only to pay interest. Stressing that "a party resisting pretrial dismissal of a reformation claim [is required] to tender a high level of proof in evidentiary form" (*id.* at 574 [internal quotation marks omitted]), the Court held that summary judgment properly was granted to Chimart notwithstanding Paul's counterclaim seeking to reform the letter agreement to require only the payment of interest. Writing for a unanimous Court, then-Judge Kaye reasoned as follows:

> "First, the contract at issue is part of a multimillion dollar transaction involving sophisticated, counseled parties dealing at arm's length. Second, the language of the agreement was plain and unambiguous, and by Paul's own admission he failed to read the agreement. Crucially, there is no unequivocal evidence of mutual mistake or fraud.

> "As to mutual mistake, Paul sets forth no basis for his contention that both parties reached an agreement other than that contained in the writing. His affidavit contains no specific claim that both parties agreed that Paul could pay only interest and in fact strongly suggests that the mistake was not mutual. The affidavit of Chimart's attorney, by contrast, squarely addresses the point: 'Whether or not [Paul] signed the Agreement under such a mistaken impression, I can state categorically that Chimart did not labor under the same mistaken impression. As noted above, I played a key role in helping Chimart to negotiate the Agreement. I therefore have direct knowledge of the facts to which I am testifying. Without doubt, the Agreement's words reflected exactly what I intended them to reflect' " (*id.* at 574-575 [citation omitted]).

Under these circumstances, "Paul was required—and failed—to

come forward with something more than his own conclusory assertion that mistake existed" (*id.* at 575).

As Judge Kaye noted, the result in *Chimart* was "dictate[d]" (*id.* at 574) by *George Backer Mgt. Corp. v Acme Quilting Co.* (46 NY2d 211 [1978]). In *Backer*, "summary judgment was granted dismissing a reformation claim because '[a]s a matter of law, no showing free of contradiction or equivocation [came] through from the affidavits submitted' in opposition to the motion (46 NY2d, at p 220)" (*Chimart*, 66 NY2d at 574). In *Backer*, as in *Chimart*, "the negotiations had been conducted by sophisticated, counseled businessmen, and the undisputed evidence showed that the unambiguous language reflected precisely what the moving party intended" (*id.*).

Here, too, the I&L contracts are part of multimillion dollar transactions between sophisticated parties dealing at arm's length[5] and, as discussed above, the relevant language of the contracts unambiguously provides that Gerling's percentage participation is a percentage of the applicable quota share. Moreover, as in *Chimart*, Gerling submitted an affidavit from its underwriter "squarely address[ing]" (*id.* at 575) the claimed mutual mistake. With respect to the 1999 and 2000 I&L contracts, John Rausch, the Gerling underwriter who signed both contracts on behalf of Gerling, asserted that "[t]here was no mistake on my part, as I understood and intended at the time that . . . Gerling's stated share was of the reinsurers' [quota share], exactly as stated in the 1999 and 2000 contracts."

Unlike the parties raising reformation claims in *Chimart* and *Backer*, however, Gulf did not rely solely on conclusory or equivocal assertions of mistake.[6] Rather, in opposing Gerling's motion for summary judgment dismissing its reformation counter-

---

**5.** We are not told by the parties whether they were advised by counsel concerning the language of the 1999 and 2000 I&L contracts.

**6.** Gulf asserts that John Curtis, the broker from Guy Carpenter who placed the reinsurance with Gerling, testified that it was the intent of Gulf and all the reinsurers that each reinsurer's percentage participation was a percentage of Gulf's entire exposure. A review of the broker's testimony, however, makes clear that he opined—albeit with some factual predicate for his opinion—that all the reinsurers knew that their participation was stated as such a percentage. Gulf also relies on the testimony of one of its executives, Susan Morgan, that "everyone's understanding within Gulf was that [each reinsurer's percentage participation] was on a hundred percent basis." This testimony, however, also appears to reduce to opinion testimony. In any event, we need not consider whether the testimony of Curtis and Morgan supports denial of Gerling's motion, as we conclude that the motion should have been denied on the basis of other evidence adduced by Gulf.

claims, Gulf principally relied on undisputed evidence that until April 2003, i.e., until Gulf ceded the First Union claim to the reinsurers, Gerling not only received and retained the premium from Gulf but paid claims on the basis of its percentage participation being a percentage of all of Gulf's exposure for its RVI business, not a percentage of the applicable quota share. Indeed, a Gerling vice-president conceded in an affidavit that premiums and losses under the 1999 and 2000 treaties had been ceded "on a 100% basis" until April 2003. With respect to the premium, Gerling did not dispute that it had received several million dollars more from Gulf than it would be entitled to under the 1999 and 2000 treaties if its percentage participation were a percentage of the applicable quota share. Gulf also relied on documentary evidence of internal Gerling "Account Instructions" reflecting that its participation was based on 100% of Gulf's RVI business. Those instructions directed that premiums paid by Gulf to Gerling be "gross[ed] up . . . to 100%" to calculate Gerling's share.

As Supreme Court correctly recognized, to support a claim for reformation a "mutual mistake must exist at the time the agreement is signed" (*Shults v Geary*, 241 AD2d 850, 852 [1997]). Supreme Court erred, however, in concluding that this course-of-performance evidence is not probative of a belief by Gerling, when the 1999 and 2000 I&L contracts were signed, that its percentage participation was a percentage of Gulf's entire exposure for its RVI business. How the parties perform a contract necessarily is manifested after execution of the contract, but their performance is highly probative of their state of mind at the time the contract was signed. As Justice Sullivan stated in *Federal Ins. Co. v Americas Ins. Co.* (258 AD2d 39, 44 [1999]):

> "[T]he parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties.' (*Webster's Red Seal Publs. v Gilberton World-Wide Publs.*, 67 AD2d 339, 341, *affd* 53 NY2d 643.) 'Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.' (*Old Colony Trust Co. v City of Omaha*, 230 US 100, 118; *see, IBJ Schroder Bank & Trust Co. v Resolution Trust Corp.*, 26 F3d 370, 374 [2d Cir], *cert*

*denied* 514 US 1014). As Restatement (Second) of Contracts § 202, comment *g* has expressed it, 'The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.' "

To be sure, neither Gulf's course-of-performance evidence nor Gerling "Account Instructions" conclusively establish mutual mistake. Gerling countered Gulf's evidence with an affidavit from Alice Belkin, an assistant secretary and account analyst in Gerling's accounting department who was involved in reviewing and booking premiums and losses reported to Gerling by Gulf through its broker, Guy Carpenter. According to Ms. Belkin, she recorded in Gerling's books premium and loss experience relating to the reinsurance agreements with Gulf in accordance with assurances she received from Guy Carpenter, not on the basis either of any review by her of the terms of the treaties and I&L contracts or of discussions with Gerling underwriters knowledgeable about those terms. Referring to Ms. Belkin's affidavit, and apparently accepting the truth of its factual assertions, Supreme Court wrote that "Gerling explains that its acceptance of the [higher amounts of premium] was based upon its mistaken acceptance of the broker's representations to its bookkeeping department that the amounts were correct." (2007 NY Slip Op 33773[U], *13.)

If the truth of Ms. Belkin's factual assertions is accepted, Gulf's course-of-performance evidence could be viewed as equivocal (*see Jansen v United States*, 344 F2d 363, 369 [Ct Cl 1965] [the interpretation of a contract manifested by a party's performance "must be the conscious action of a responsible agent of the party against whom the interpretation is urged"]). On Gerling's motion for summary judgment, however, Supreme Court could not properly have accepted her assertions as true (*Ferrante v American Lung Assn.*, 90 NY2d 623, 631 [1997] ["It is not the court's function on a motion for summary judgment to assess credibility"]). Moreover, as Gerling was the moving party seeking summary judgment dismissing Gulf's reformation counterclaims, Gulf was entitled to have all reasonable inferences drawn in its favor (*Branham v Loews Orpheum Cinemas, Inc.*, 8 NY3d 931, 932 [2007]). The trier of fact might have a favorable impression of Ms. Belkin's credibility. But it also might regard testimony in accordance with those factual assertions as a deus ex machina, appearing too suddenly and conveniently after Gulf ceded the First Union claim to its reinsurers. Gulf

contends, and we agree, that from all the evidence it submitted, a factfinder reasonably could conclude that a multibillion dollar reinsurance company does not collect the premium and pay losses for more than three years without any internal controls whatsoever to ensure that the substantial amounts it receives and pays are consistent with the terms of the underlying contracts. As a panel of the Third Department stated in a similar context, "we think it cannot be said on this record that a reasonable person could by no rational process find the evidence of mutual mistake to be clear, positive and convincing . . . [S]ummary judgment on affidavits should not be granted where there is any doubt as to the existence of triable issues of fact" (*Weiss v Garfield*, 21 AD2d 156, 159-160 [1964] [internal quotation marks omitted]).

In sum, Gulf was not required to come forward with incontrovertible proof of mutual mistake. It met the heavy burden it was required to shoulder of coming forward with "unequivocal evidence of mutual mistake" "in evidentiary form" (*Chimart*, 66 NY2d at 574), and Gerling's motion for summary judgment dismissing Gulf's reformation counterclaims should have been denied.[7]

## C

■ Under Endorsement Number 1 to the 1999 treaty, the "Term" of the treaty is stated to be "Effective January 1, 1999 at 12:01 A.M., Eastern Standard Time, to January 1, 2000 at 12:01 A.M. Eastern Standard Time, as respects losses occurring on *policies attaching during the term*" (emphasis added). Under article I of the treaty, "Business Covered," Gulf ceded to the reinsurer a "quota share participation of the net retained insurance liability of [Gulf] on each risk insured under *new and renewal policies becoming effective* at and after 12:01 A.M., Eastern Standard Time, January 1, 1999, as respects losses occurring at and after said date covering business classified by [Gulf] as Automobile Residual Value Insurance" (emphasis added). The term "policies" is defined in article I as "[Gulf's] binders, policies and contracts providing insurance and reinsurance on the business covered under this Agreement." Article XXVI of the treaty provides in relevant part that "[t]his Agreement shall be

---

7. Gerling's other arguments for affirmance, including its argument based on changes to the 2001 treaty and I&L contract that indisputably state Gerling's percentage participation as a percentage of Gulf's entire RVI exposure, are unpersuasive.

governed by and construed according to the laws of the State of New York."

The verb "attaching" is not expressly defined in the treaty. The parties do not cite to any New York cases construing the word, although they cite to various treatises. Its meaning, however, seems clear from the above-quoted language of article I of the treaty, and the parties appear to be in agreement that a policy, be it a "new" or a "renewal" policy, "attach[es]" during the term of the treaty if it becomes effective during the treaty's term. If policy A had a term of one year beginning on December 1, 1998 and policy B had a term of one year beginning on December 1, 1999, policy A would not be a policy "attach[ing] during the term" of the treaty, but policy B would be; no losses occurring on policy A (as a result of leases issued by the insured during its term) would be reinsured under the treaty, but all losses occurring on policy B would be reinsured under the treaty (even if no leases were issued by the insured in 1999).

The parties agree that Gulf provided coverage to First Union under an RVI policy for the first three months of 1999. The parties also agree that the original RVI policy issued by Gulf to First Union was effective as of January 1, 1996 at 12:01 A.M., Eastern Standard Time (the 1996 policy). The parties appear to agree that the 1996 policy had a 12-month policy period and that coverage for each of the following two calendar years was provided under distinct policies (the 1997 and 1998 policies).[8]

---

8. The "Declaration" section of the original RVI policy issued by Gulf and First Union states only a policy effective date of "1/1/96" at "12:01 A.M. [Eastern] Standard Time" without stating a calendar date on which coverage expires. Rather, the "[p]olicy period is defined as a twelve month beginning 1 January 1996 and each twelve month period thereafter." The policy also states that "[u]nless discontinued as herein provided this policy shall be automatically renewed from year to year." With respect to cancellation, the policy "may be cancelled by you or us by sending written notice to the other, stating when, not less than 30 days thereafter, such cancellation will be effective." Although Gulf states in its brief that "[f]rom 1996 through 1998, Gulf and First Union renewed the policy each year," Gulf does not state whether the policy was renewed automatically or otherwise. Gerling, however, states in its brief that the 1996 policy "was endorsed to reflect renewals with effective dates of 1/1/97 and 1/1/98." Presumably, the endorsements to which Gerling refers are a "General Change Notice" effective January 1, 1997 and a "General Change Notice" effective January 1, 1998. In addition to setting forth various changes to the policy, the former notice states, consistently with the 1996 policy, that the "[p]olicy period is defined as a twelve month period beginning 1 January 1996 and each twelve month period thereafter." The latter change notice contains no definition of the "policy period."

Although the parties also agree that the coverage in early 1999 was the result of an "agreement" between Gulf and First Union to extend coverage on the same terms as the 1998 policy while negotiations were ongoing, they disagree about whether that coverage was provided pursuant to a policy "attaching" during 1999. More specifically, they disagree about whether the 1999 coverage was pursuant to a "new" or a "renewal" policy that became effective in 1999. We are not told whether the agreement was an oral one, although it presumably was, or whether it was reached before or after December 31, 1998; nor do the parties cite to any evidence bearing on the question of whether the agreement, as opposed to the coverage, was effective as of a date in 1998, as of 12:01 A.M. on January 1, 1999 or as of a later time and date in 1999.

Supreme Court granted partial summary judgment to Gerling declaring that the extension of coverage into 1999 under the 1998 policy is not covered by the 1999 treaty, and denied partial summary judgment to Gulf declaring that Gerling is obligated to indemnify Gulf under the 1999 treaty for Gerling's share of the First Union settlement ceded to the 1999 RVI coverage. According to Supreme Court, the extension of coverage into 1999 did not "constitute[ ] a renewal" of the 1998 policy. (2007 NY Slip Op 33773[U], *8.) Supreme Court relied on one of the definitions of the term "renewal" in Black's Law Dictionary— i.e., "The re-creation of a legal relationship or the replacement of an old contract with a new contract, as opposed to the mere extension of a previous relationship or contract" (Black's Law Dictionary 1322 [8th ed])—and, because First Union is a North Carolina corporation, on a North Carolina precedent quoting that definition in support of the conclusion that an insurance policy was "subject to renewal" within the meaning of a North Carolina statute (*Duganier v Carolina Mtn. Bakery*, 179 NC App 184, 189, 633 SE2d 696, 700 [2006]).

Gulf argues, among other things, that Supreme Court erred in looking to North Carolina law; that under New York law, the "renewal" of insurance coverage includes an extension of the policy's period or term; that, in any event, the agreement to provide coverage effective January 1, 1999 on the basis of the terms of the 1998 policy constituted a new contract of insurance (and thus a "policy" of insurance within the meaning of the

---

In their briefs, the parties do not refer to or base any arguments on the language quoted above from the 1996 policy and the 1997 General Change Notice. Accordingly, the legal import of that language is not before us.

treaty) that attached during the term of the treaty; and that, even assuming ambiguity about whether a policy "extended" to cover part of 1999 "attached" in 1999, extrinsic evidence supports its position that the parties intended losses under the 1999 coverage of First Union to be reinsured under the treaty.[9]

Gerling argues, among other things, that the deposition testimony of Susan Morgan, an executive of Gulf who was involved in the preparation of the "policies attaching" language of Endorsement Number 1, establishes that losses occurring on RVI leases issued by First Union in early 1999 "go back" to the 1998 policy and thus are reinsured under the 1998 treaty, not the 1999 treaty; that Gulf admitted that the RVI coverage was not renewed in 1999; that no new coverage attached on January 1, 1999 by virtue of the agreement to extend the prior year's coverage; that Supreme Court properly looked to North Carolina law; and that Gulf's reliance on a provision of New York law is misplaced.

Contrary to Gerling's contention, the testimony of Ms. Morgan does not establish the correctness of its position. As Gulf maintains, Ms. Morgan was addressing a hypothetical RVI policy that became effective in one calendar year (either at the beginning of or at a later date during the year) and, by its terms, continued to be in effect as of the beginning and during a portion of the next calendar year. Thus, to vary somewhat for ease of exposition an example posited by Ms. Morgan, if the terms of such a policy provided that it would be in effect from January 1, 1998 through March 31, 1999, losses occurring on leases issued by the insured during the first three months of 1999 would not be reinsured under the 1999 treaty, because the policy "attached"—i.e., took effect—before the term of the treaty commenced on January 1, 1999. By contrast, as Ms. Morgan also explained, under the wording of the treaty before it was amended by Endorsement Number 1—i.e., "Effective January 1, 1999 at 12:01 A.M., Eastern Standard Time, to January 1, 2000 at 12:01 A.M., Eastern Standard Time, as respects losses

---

**9.** Gulf also asserts in its main brief that "[a]ny policy insuring losses occurring during 1999 'attached' during that year and, as such, the losses are covered under the treaty." As Gerling correctly argues in response, however, the reinsurance furnished by the treaty is not triggered by the occurrences of a loss in 1999—i.e., the treaty is not a "losses-occurring" treaty—and a loss on a First Union lease issued in 1999 could not occur until after 1999, when the lease went to its full, multi-year term. This incorrect assertion, which Gulf does not defend in its reply brief, is of no moment as it does not undermine Gulf's other arguments.

occurring on *leases incepting* during the term of this Agreement" (emphasis added)—the same losses would be reinsured under the treaty, because the leases resulting in the losses "incepted"—i.e., were issued—during the term of the treaty. Gerling's reliance on Ms. Morgan's testimony simply assumes that the 1999 coverage was pursuant to a policy indistinguishable from the hypothetical policy.

Contrary to Supreme Court's conclusion, because the treaty expressly states that it "shall be governed by and construed according to the laws of the State of New York," North Carolina law is not controlling on the meaning of the word "renewal" in the treaty. In attempting to defend that conclusion, Gerling does no more that assert its correctness. However, the definition of the word "renewal" in Black's Law Dictionary provides some support for Gerling's position that the 1998 policy was not renewed in 1999. But as Gulf stresses, another definition of the word supports its position. Insurance Law § 3426 (a) (4) provides as follows: " 'Renewal' or 'to renew' means the issuance or offer to issue by an insurer of a policy superceding a policy previously issued and delivered by the same insurer . . . or the issuance or delivery of a certificate or notice *extending the term of a policy beyond its policy period or term*" (emphasis added). To be sure, Gerling maintains that section 3426 "applies neither to residual value policies, nor to non-NY policies."[10] Moreover, although Gerling does not make the point, Gulf does not contend that it issued or delivered "a certificate or notice extending the term" of the 1998 policy beyond "its policy period or term." Nonetheless, Gulf's central point on this score is that the statutory definition of the term "renewal" supports its position because the mere extension of a policy beyond its policy period or term can constitute a renewal of the policy. As between the two definitions, the one defining the term as a matter of New York law in the specific context of insurance is more illuminating. But as discussed below, the ambiguity of the term is not decisive.

Gerling is not persuasive in asserting that Gulf has "admitted" that the RVI coverage was not renewed in 1999. Of the three witnesses whose deposition testimony Gerling cites in support of the assertion, two of the witnesses—an employee of

---

**10.** In this regard, Gerling cites, among other authorities, an opinion of the Insurance Department concluding that RVI policies are exempt from the cancellation and nonrenewal provisions of Insurance Law § 3426 (*RE: Proposed Residual Value Policy*, Ops Gen Counsel NY Ins Dept No. 04-04-15, at 1 [Apr. 20, 2004]).

Lee & Mason of Maryland, Inc. (L&M), the program manager through which Gulf wrote its RVI business, and an employee of First Union's broker—testified only that the 1998 coverage was extended in 1999 and did not even offer opinions on the legal issue of whether the extension constituted a "renewal" of the coverage. Only the third witness, another employee of L&M, opined that the 1998 policy "was not renewed" and went on to state that it "was extended for three months . . . at the same terms as the '98 policy year, and then it was, they did not renew it." This witness' opinion, however, is not a binding admission by Gulf (*see* Prince, Richardson On Evidence § 8-219, at 530 [Farrell 11th ed]; *see also Matter of Union Indem. Ins. Co. of N.Y.*, 89 NY2d 94, 103 [1996]; *Baje Realty Corp. v Cutler*, 32 AD3d 307 [2006]).

Putting aside the question of ambiguity in the phrase "renewal policies" in article I of the treaty, Gulf argues that the reference in article I to "new . . . policies" unambiguously includes the agreement to provide coverage effective January 1, 1999 on the same terms as the 1998 policy. In response, Gerling argues only that the agreement is not a "new" policy because it is an extension of the 1998 policy. This response fails to meet Gulf's overarching contention that any distinctions between, on the one hand, the agreement to extend coverage and, on the other, either a "new" or "renewal" policy, are purely formal.

In any event, this debate obscures the real issue, which is one of substance. Regardless of whether the agreement is characterized as an "extension," a "new" or a "renewal" policy, the decisive question is whether that policy attached—i.e., became effective—during the term of the treaty. The point is illustrated by considering another contractual variant, an amended policy. If the 1998 policy had been amended in early 1998 to extend the period of the policy through March 31, 1999, the amended policy would be indistinguishable from the hypothetical policy discussed above. Because the amended policy, like the hypothetical policy, would have attached in 1998, before and not during the term of the treaty, losses occurring on leases issued during the first three months of 1999 would not be reinsured under the treaty. The analysis could not be different if the amendment occurred in late 1998, perhaps just days from the expiration of the term of the 1998 policy. Of course, instead of agreeing to such an amendment in late December 1998, a new policy could have been issued in late December 1998 with a term running from January 1, 1999 to March 31, 1999. Because the new policy

would have attached in 1999, losses occurring on the policy would be reinsured under the treaty. Even then, the form of the agreement, a new policy rather than an amended policy, would not be the decisive factor. Rather, the parties' intent that the agreement become effective on a date during the term of the treaty would be decisive.

Accordingly, if Gulf and First Union agreed in 1998 to extend the 1998 policy and intended their agreement to be effective in 1998, Gerling would be entitled to summary judgment. But if Gulf and First Union agreed in 1999 to extend the 1998 policy, or agreed in 1998 to such an extension but intended their agreement to be effective in 1999, Gulf would be entitled to summary judgment (putting aside, of course, Gerling's claim that it is entitled to rescission of the 1999 treaty). As neither party alerts us to any evidence presented to Supreme Court bearing on when the agreement was reached or when it was intended to be effective, neither party met its burden and each party's motion for partial summary judgment should have been denied.[11]

## D

Gulf contends that a "separate agreement between Gulf and Gerling reinsured section B [i.e., Gulf's liabilities under the RVI policy it issued to a subsidiary of General Electric] from August 1, 1998 through December 31, 1998, which was intended to be memorialized in a separate I&L contract for the 1998 period." Supreme Court granted Gerling's motion for partial summary judgment declaring that it has no liability for losses arising from the section B coverage provided during the last five months of 1998, ruling that Gulf's claim of an oral agreement is barred by the terms of a reinsurance placement slip, which states an effective date of January 1, 1999 for both sections and provides both that it constitutes the entire agreement of the parties and that any modification is void unless made in a writing signed by the parties. Although Gulf notes that the placement slip Supreme Court relied on was superseded by the 1999 treaty, Gerling points out that the relevant language of the placement slip is replicated verbatim in the treaty. However, stressing that its claim is that a "separate" agreement existed, Gulf argues

---

**11.** According to Gulf, Gerling also argued before Supreme Court that the First Union settlement was in part an extracontractual liability for which it was not responsible under the treaty. To the extent Gerling did so contend, that contention has been abandoned as Gerling does not raise it in its brief (*see e.g. Gary v Flair Beverage Corp.*, 60 AD3d 413, 415 [2009]).

that Supreme Court erred and asserts that "[w]hether the oral agreement is characterized as applying the 1999 Treaty retroactively or as an independent agreement to reinsure the 1998 period is of no moment."

■ Gulf cites no authority in support of its assertion that despite the effective date of the 1999 treaty, its integration clause and its provision barring oral modifications, the oral agreement is valid even if it is "characterized as applying the 1999 treaty retroactively." On Gulf's view, the integration clause and the provision barring oral modifications are not implicated by the oral agreement because it is a "separate" agreement, i.e., not in substance a modification of the written agreement. Gerling does not take issue with Gulf in this regard, and instead advances independent reasons for affirming Supreme Court's order granting its motion for summary judgment regarding section B coverage during the last five months of 1998. Because Gerling is correct that in opposing its motion for summary judgment Gulf failed to raise a triable issue of fact with respect to the existence of the oral agreement, we need not decide whether recognizing the agreement's validity would be inconsistent with the treaty's integration clause and its provision barring oral modifications.

"To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms" (*Matter of Express Indus. & Term. Corp. v New York State Dept. of Transp.*, 93 NY2d 584, 589 [1999]). As stated by the Fourth Department, a party cannot defeat summary judgment with affidavits that are "purely conclusory and do not set forth such necessary evidentiary details as when, where or by whom the alleged oral agreement was made or the substance of the conversations" (*Apache-Beals Corp. v International Adjusters*, 59 AD2d 1032, 1033 [1977], *affd* 46 NY2d 888 [1979]).

Gulf failed not only to identify the Gerling representative who made the oral agreement, it did not set forth any evidentiary details as to "when, where or by whom the alleged oral agreement was made or the substance of the conversations" (*id.*). The March 29, 1999 fax from Guy Carpenter to John Rausch of Gerling, purporting to "confirm," among other things, coverage under section B "[e]ffective August 1, 1998," does not identify "when, where or by whom" Gerling agreed to such coverage. It was undisputed, moreover, that Rausch did not respond to the fax or to a subsequent letter from Guy Carpenter enclosing for Rausch's signature an I&L contract for

section B coverage only for the period from August 1, 1998 through December 31, 1998. The other facts Gulf relies on, including Gerling's receipt of a premium from Gulf consistent with participation by Gerling on section B coverage for the last five months of 1998, might be sufficient to establish an implied contract (*see generally Parsa v State of New York*, 64 NY2d 143, 148 [1984]), but that question is not before us. As is clear from its briefs in this Court and its "Counterstatement of Material Facts in Opposition to Gerling's Motion for Partial Summary Judgment," Gulf's claim is that it had an actual, oral agreement with Gerling.

Accordingly, Supreme Court properly declared that Gerling is not obligated to reimburse Gulf for losses arising from business covered by the 1998 treaty.

### E

■ Gulf moved for partial summary judgment on its first cause of action asserting that Gerling breached its indemnification obligations under the 1999 treaty by refusing to pay its alleged share of the First Union settlement. Gerling opposed the motion on the ground that it was entitled to rescission of the treaty because of misrepresentations and nondisclosures of material information by Gulf. Although our reasoning differs from Supreme Court's, we conclude that Gulf's motion properly was denied.

"A reinsured is obliged to disclose to potential reinsurers all material facts concerning the original risk, and failure to do so generally entitles the reinsurer to rescission of its contract" (*Sumitomo Mar. & Fire Ins. Co.—U.S. Branch v Cologne Reins. Co. of Am.*, 75 NYOctober 2, 20092d 295, 303 [1990] [internal quotation marks omitted]). "The relationship between a reinsurer and a reinsured is one of utmost good faith, requiring the reinsured to disclose to the reinsurer all facts that materially affect the risk of which it is aware and of which the reinsurer itself has no reason to be aware" (*Christiania*, 979 F2d at 278; *see also Unigard Sec. Ins. Co., Inc. v North Riv. Ins. Co.*, 4 F3d 1049, 1069 [2d Cir 1993] [duty of utmost good faith requires reinsured to "place the reinsurer in the same situation as himself" with respect to assessment of the risk (internal quotation marks and brackets omitted)]). Although "the failure to disclose need not be fraudulent or even intentional, the party with a duty to disclose must at least have reason to believe the fact not disclosed is material" (*Christiania*, 979 F2d at 279).

"Material facts are those likely to influence the decisions of underwriters; facts which, had they been revealed by the reinsured, would have either prevented a reinsurer from issuing a policy or prompted a reinsurer to issue it at a higher premium" (*Matter of Union Indem. Ins. Co.*, 89 NY2d at 106).

Viewed in a light most favorable to it, the party opposing summary judgment, Gerling came forward with evidence that when Gulf solicited its participation in the RVI program in late 1998, Gulf did not disclose that it, through L&M—a firm Gulf describes as the "specialized program manager or managing general agent" through which it wrote its RVI business—was seeking a 360% increase in the premium rate on its largest policy, the First Union policy, even though, in response to inquiries from John Rausch, Gerling's underwriter, Gulf stated that it was too early in the program to seek premium adjustments from its insureds.

Gulf does not dispute that the First Union policy, which was due to expire on December 31, 1998, represented about half of the program premium reported, that L&M was seeking such a substantial premium increase or that Gerling was not informed of the requested premium increase before it agreed to participate in the 1999 treaty.[12] Rather, Gulf's principal argument is that there is no evidence that it knew, at the time Gerling was solicited to participate in the RVI program, about the premium rate L&M was attempting to negotiate for the First Union policy. In this regard, Gulf argues that L&M's knowledge of the significant rate increase it was seeking from First Union cannot be imputed to it because L&M acted not as its agent but as an independent contractor. That argument is meritless. Its sole support is a single recitation in the agreement between Gulf and L&M, an agreement that is entitled "General Agency Agreement," stating that "the General Agent [i.e., L&M] is not an employee of the Company [i.e., Gulf] for any purpose, but is an independent contractor for all purposes and in all situations." Regardless of whether this recitation might be effective to disclaim an employment relationship, it is not effective as a disclaimer of an agency relationship (*Rubenstein v Small*, 273 App Div 102, 104 [1st Dept 1947] [a "court is not bound by the disclaimer of . . . agency between the parties in determining their true relationship"]). Under "New York common law . . . an agency relationship 'results from a manifestation of consent

---

12. As noted above, First Union paid the 1998 premium rate for the coverage it obtained in the first three months of 1999.

by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act' " (*New York Mar. & Gen. Ins. Co. v Tradeline [L.L.C.]*, 266 F3d 112, 122 [2d Cir 2001], quoting *Meese v Miller*, 79 AD2d 237, 242 [4th Dept 1981]). As a review of the "General Agency Agreement" makes clear, the true relationship between Gulf and L&M with respect to Gulf's RVI program is that of principal and agent.

Accordingly, L&M's knowledge of the premium increase sought from First Union on behalf of Gulf is properly imputed to Gulf (*Farr v Newman*, 14 NY2d 183, 187 [1964] [a "principal is bound by . . . knowledge of his agent in all matters within the scope of his agency although in fact the information may never actually have been communicated to the principal"]; *see also New York Mar. & Gen. Ins. Co.*, 266 F3d at 121-123 [imputing knowledge of its agent to insurer]). Gulf unpersuasively argues that in the reinsurance context the knowledge of a reinsured's agent cannot be imputed to the reinsured for the purposes of a rescission claim. No case cited by Gulf purports so to hold or even to suggest that the common-law rule imputing the knowledge of an agent to the principal is not applicable in the reinsurance context. Nor does Gulf provide any justification for such an exception or reconcile it with the duty of utmost good faith owed by reinsureds.

Of course, the materiality of the requested premium increase is for the trier of fact (*Feldman v Friedman*, 241 AD2d 433, 434 [1997]). But insofar as Gerling thus raised a triable issue of fact as to whether it is entitled to rescission of the 1999 treaty, Gulf's motion for partial summary judgment properly was denied. We need not consider any of Gerling's other claims of misrepresentations and failures to disclose that essentially warrant rescission of the 1999 treaty. Finally, as Gerling did not move for summary judgment to rescind the 1999, 2000 or 2001 treaties, its arguments that it is entitled to summary judgment are not properly before us (*see e.g. Dunham v Hilco Constr. Co.*, 89 NY2d 425 [1996]), and we grant Gulf's motion to strike Gerling's appellate request for summary judgment on its rescission claims.

Accordingly, the order of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered November 29, 2007, which denied plaintiff Gulf's motion for partial summary judgment, and granted defendant Gerling's motion for partial summary judgment, should be modified, on the law, to the extent of

reversing that portion of the order which granted partial summary judgment to Gerling on its reformation counterclaims and reinstating Gulf's reformation counterclaims, and reversing that portion of the order which declared that the First Union policy is not covered by the 1999 treaty, and otherwise affirmed, without costs.

Motion seeking leave to strike defendant Gerling's appellate request for summary judgment on its rescission claims granted.

SAXE, J.P., NARDELLI and CATTERSON, JJ., concur.

Order, Supreme Court, New York County, entered November 29, 2007, modified, on the law, to the extent of reversing that portion of the order which granted partial summary judgment to Gerling on its reformation counterclaims and reinstating Gulf's reformation counterclaims, reversing that portion of the order which declared that the First Union Policy is not covered by the 1999 treaty, and otherwise affirmed, without costs. Motion seeking leave to strike defendant Gerling's appellate request for summary judgment on its rescission claims granted.