■ WARBERG OPPORTUNISTIC TRADING FUND L.P. et al., Appellants-Respondents, and WATERSTONE CAPITAL MANAGEMENT, L.P., Respondent, v GEORESOURCES, INC., Respondent-Appellant. WARBERG OPPORTUNISTIC TRADING FUND L.P. et al., Respondents-Appellants, and WATERSTONE CAPITAL MANAGEMENT, L.P., Respondent, v GEORESOURCES, INC., Appellant-Respondent. [58 NYS3d 1]—

Judgment, Supreme Court, New York County (Saliann Scarpula, J.), entered March 24, 2016, awarding plaintiff Waterstone Capital Management, L.P. (Waterstone) the sum of $1,845,428.51, plus interest from July 2, 2012 in the sum of $619,305.58, for the total sum of $2,464,734.09, unanimously reversed, on the law, with costs and the judgment vacated. Order, same court and Justice, entered December 1, 2015, which, to the extent appealed from as limited by the briefs, denied plaintiffs' motion for summary judgment on their cause of action for reformation as to plaintiffs Warberg Opportunistic Trading Fund L.P. (Warberg) and Option Opportunities Co. (OOC) and granted the motion as to plaintiff Waterstone Capital Management, L.P. (Waterstone), and granted defendant GeoResources, Inc.'s motion for summary judgment dismissing the reformation cause of action with respect to Warberg and OOC and denied the motion as to Waterstone, unanimously modified, on the law, to deny summary judgment to all parties, and otherwise affirmed, without costs. Appeal from order, same court and Justice, entered February 29, 2016, which determined the damages awarded Waterstone, unanimously dismissed, without costs, as subsumed in the appeal from the judgment.

This appeal concerns a pool of warrants to purchase shares in defendant GeoResources. The warrants, which were issued in June 2008, gave their holders the right to purchase a specified number of shares at any time from six months after the purchase date until June 9, 2013, at an exercise price of $32.43 per share. Each warrant included "anti-dilution" provisions, which were intended to protect the holder's investment in the event that defendant issued or sold stock, or took any of the several specified actions deemed to be an issuance or sale of stock. Section 8 (f) of the warrants contained a formula that provided for the adjustment of the exercise price in such a circumstance. However, section 8 (h) established a floor below which the exercise price could not drop, by providing as follows: "Notwithstanding any other provisions of Section 8 (f) to the contrary, no adjustment provided for in Section 8 (f) shall result in a reduction of the Exercise Price to an amount less than $32.43 per Warrant Share (as appropriately adjusted for the occurrence of any events listed in [other anti-dilution clauses of Section 8])." That the floor price was the same as the exercise price, a result which would appear to defeat the very purpose of the anti-dilution provision, is the subject of this appeal.

Plaintiff Waterstone purchased its warrants directly from defendant at the time of issuance. Plaintiffs Warberg and OOC, on the other hand, did not acquire their warrants directly from defendant, but on the secondary market, in seven separate transactions. Four of the transactions entered into by Warberg and OOC were pursuant to agreements with other secondary purchasers of the warrants, which provided that the sellers "shall sell, convey, assign and deliver to the Buyer, and the Buyer shall purchase from the Seller, the Securities and any and all rights and benefits incident to the ownership thereof." The three remaining transactions were with initial investors such as Waterstone (but not Waterstone itself). The agreements governing those transactions employed the above language, and further provided that, with respect to title to the securities, the seller "is the lawful owner" of the securities with "good and marketable title," and "has the absolute right to sell, assign, convey, transfer and deliver the Securities and any and all rights and benefits incident to the ownership thereof . . . all of which rights and benefits are transferable by the Seller to the Buyer pursuant to this Agreement, free and clear of all [claims]," including "security interests, liens, pledges, claims (pending or threatened), charges, escrows, encumbrances."

As provided for in the purchase agreements governing the Warberg and OOC warrant purchases, the sellers of those warrants first delivered them to defendant, which cancelled them and issued new warrants, transferring them to Warberg and OOC pursuant to "Assignment Forms." Two of those forms provide that "for value received, the foregoing Warrant and all rights evidenced thereby are hereby assigned to [Warberg and OOC]." The remaining Assignment Forms state that plaintiffs were transferred "all of the rights of [the assignor] under this Warrant."

In December 2009 and January 2011, defendant sold shares for less than the exercise price of $32.43. After the January 2011 sale of stock, Waterstone raised with defendant the possibility that the purchase price in its warrants would need to be reduced pursuant to the anti-dilution provision, and discussions among the parties about a possible adjustment continued over the following year. However, no accommodation was reached. Plaintiffs, in communications among themselves, focused on an unsigned, draft warrant that had been circulated to the initial investors in June 2008, right before defendant issued the warrants. The draft was attached to an email from Nicholas Wunderlich, an executive at Wachovia Securities, which defendant had hired as its placement agent in connec-

tion with the issuance of the warrants. Wunderlich wrote to the investors that "[i]t has been brought to my attention that when final docs for the . . . transaction were distributed last week, certain information (such as date, share count, and exercise price of warrant) was left blank. These amounts do not differ from what was communicated to you last week. However, attached for your records are the documents in their final form with this information inserted." Section 8 (h) of the draft warrant that was attached to the email stated $28.07 as the floor price, in contrast to the $32.43 figure contained in the final, issued warrant.

Plaintiffs initiated this action asserting that defendant had breached the contract by failing to adjust the exercise price, and seeking damages and specific performance. The complaint alleged causes of action for breach of contract, specific perform- ance, declaratory relief, fraudulent inducement, promissory estoppel, and unjust enrichment. Defendant moved to dismiss the complaint, on the basis that the warrants were unambigu- ous and set a floor price of $32.43. Supreme Court granted the motion to the extent of dismissing plaintiffs' claims for declara- tory relief, promissory estoppel, fraudulent inducement, and unjust enrichment only. This Court unanimously affirmed (112 AD3d 78 [1st Dept 2013]). We found that "the 'notwithstand- ing' provision in section 8 (h) clearly overrides any conflicting provisions in section 8 (f)," even though "it renders the adjust- ment formula in section 8 (f) impotent" (id. at 83). The breach of contract claim was allowed to proceed based on the draft warrant attached to the Wunderlich email. We noted that "the email appears to have been sent only to employees of Water- stone and not to Warberg or OOC. Unless there is evidence to prove that the floor price error applies to all plaintiffs' war- rants, then the claims by Warberg and OOC should be dismissed because the floor price in their warrants would remain $32.43. However, that is an issue to be determined by the trial court after some discovery" (112 AD3d at 85 n 4).

Following this Court's decision, plaintiffs filed amended complaints, the second of which whose cause of action for refor- mation is the sole issue on this appeal. Plaintiffs claim that the floor price was intended to be $28.07, but that through a scrivener's error, the warrants were issued with an erroneous floor price of $32.43. In support of their claim of scrivener's er- ror, plaintiffs cited the Wunderlich email and the attachment thereto. Defendant moved for summary judgment dismissing the amended complaint, arguing, as relevant here, that the ev- idence of the parties' intent with respect to the floor price term

was not sufficient to support a claim of reformation. Plaintiffs opposed the motion for summary judgment, and, as relevant here, moved for summary judgment on their reformation claims, arguing that the evidence conclusively established that the parties intended the floor price to be $28.07.

The court granted Waterstone summary judgment on its reformation cause of action, and granted defendant's motion to the extent of dismissing the complaint with respect to Warberg and OOC. The court cited the Wunderlich email, as well as other emails between Waterstone and its representatives. The court emphasized that Wachovia was defendant's agent with respect to the transactions at issue, regardless of the fact that its engagement letter with defendant included a limitation-of-engagement clause stating that Wachovia was to serve as an independent contractor and disclaiming the creation of a fiduciary duty or agency relationship. The court concluded that this only limited the scope of the agency, and that the documentary evidence "plainly show[s] that [defendant] had an agency relationship with Wachovia such that it made binding offers with respect to the warrants at issue here" (2015 NY Slip Op 32269[U], *10 [2015]). Given that agency relationship, the court found it clear that the parties had agreed to the $28.07 floor price, and that the $32.43 price was a scrivener's error made by defendant's counsel. The court rejected as "nonsensical" (id.) the argument that the parties intentionally nullified the anti-dilution provision. The court further found that the deposition testimony of defendant's top executives and outside counsel did not raise an issue of fact as to this issue because they either did not remember anything about the floor price or had no actual knowledge of how the floor price was set.

While the court found that Waterstone believed the floor price to be $28.07, it also found that, since Warberg and OOC purchased their warrants on the secondary market, and Wachovia never directly communicated to them the lower floor price, they had presented no evidence that they had reason to believe that the floor price was lower than the one listed in the warrants they had received. The court rejected their claim that they stood in the shoes of the initial purchasers who did receive the Wunderlich email, interpreting the warrant assignment documents as indicating that the parties intended to limit the conveyance to the documents themselves and to sever any rights arising from the negotiations between defendant and the initial purchasers.

The court further found that the cancellation of the warrants and the reissuing of them before they were transferred to

Warberg and OOC effected a novation, wiping out any right to reformation that might have otherwise flowed from the original warrants.

We first consider defendant's argument that the court erred in awarding summary judgment to Waterstone. It claims that Waterstone was not entitled to reformation because it did not establish that the $32.43 floor price in the issued warrants reflected a mistake on the part of both parties, and that the parties actually intended that the floor price would be $28.07. This, defendant contends, is because, despite receipt of the Wunderlich email, Waterstone took no steps to seek reformation of the warrants, not even seeking that relief in its initial complaint. Defendant argues that mutual mistake must exist at the time the contract is entered into, and that Waterstone did not form a belief until years after the warrants were issued that there was a mistake in them. Defendant also asserts that there is no evidence that it believed the floor price to be $28.07. To the contrary, it points to deposition testimony from its employees and counsel asserting that the $32.43 floor price in the issued warrants did not reflect a mistake. Defendant seeks to negate the impact of the Wunderlich email by arguing that Wachovia was not its agent, and so it was not bound by the draft warrant attached to the email.

Waterstone, on the other hand, cites evidence showing that defendant's CEO was told by Wachovia that the floor price would be set at the June 5, 2008 closing stock price, which was $28.07, and that Wachovia's counsel, defendant's counsel, and defendant's CEO discussed using $28.07 as the floor price. Waterstone also cites deposition testimony from Wachovia and its counsel stating that defendant agreed to issue warrants with a $28.07 floor price. Waterstone further argues that its conduct after the warrants were issued is explained by the fact that, while it became aware in 2011 that the anti-dilution protections in the warrants it had bargained for were not effective because they listed $32.43 as the floor price in Section 8 (h), it did not learn the details of how the floor price was set at that level until there was discovery in this case.

" 'A claim for reformation of a written agreement must be grounded upon either mutual mistake or fraudulently induced unilateral mistake,' " and to succeed, the party seeking relief "must establish by 'clear, positive and convincing evidence' that the agreement does not accurately express the parties' intentions" (see 313-315 W. 125th St. L.L.C. v Arch Specialty Ins. Co., 138 AD3d 601, 602 [1st Dept 2016]). "Reformation based upon a scrivener's error requires proof of a prior agreement be-

tween [the] parties, which when subsequently reduced to writing fails to accurately reflect the prior agreement" (*US Bank N.A. v Lieberman*, 98 AD3d 422, 424 [1st Dept 2012]). The parties' course of performance under the contract, or their practical interpretation of a contract for any considerable period of time, is the most persuasive evidence of the agreed intention of the parties (*Gulf Ins. Co. v Transatlantic Reins. Co.*, 69 AD3d 71, 85 [1st Dept 2009]).

Given the need for "clear, positive and convincing evidence" of mutual mistake (*313-315 W. 125th St. L.L.C.*, 138 AD3d at 602), we find that issues of fact are present that should have prevented summary judgment from being awarded to Waterstone. The evidence does not unequivocally show that either Waterstone or defendant believed the agreed upon floor price was $28.07. To be sure, defendant relied heavily on Wachovia to handle the warrant transaction, including the setting of the floor price, and Wachovia employees testified that they believed the floor price was intended to be $28.07. However, the evidence shows that defendant had a hand in the drafting process. Thus, we may not entirely disregard the deposition testimony of defendant's employees and counsel that they did not consider the $32.43 floor price in the final warrants to be the result of a mistake.

In any event, mutual mistake requires that both parties to an agreement have the same belief, and the evidence with respect to Waterstone's belief is too tenuous to justify summary judgment. For example, that Wachovia circulated a draft warrant with $28.07 as the floor price is surely supportive of Waterstone's theory. However, without any documentary evidence reflecting any prior communications concerning the price, or any testimony from Waterstone indicating what it believed the floor price was to be, it is impossible to find as a matter of law that Waterstone expected the true floor price to be $28.07. In addition to the absence of clear evidence of Waterstone's belief, its failure over the course of several years to affirmatively articulate a belief that the final floor price was a mistake, also militates against a grant of summary judgment. Although, as it argues, Waterstone might not have been able to allege all the circumstances of the purported floor price mistake until it obtained discovery in this action, it knew, or should have known from the outset, that the floor price in the final warrant was set at $32.43, which rendered the anti-dilution provision meaningless. Its failure to claim mutual mistake until 2013, even after it sought an adjustment in the exercise price in 2011 and initiated this lawsuit in 2012 based on the

separate theory that the anti-dilution provision was merely being misinterpreted, undermines its claim that it believed that it had agreed to the $28.07 floor price and that there had been a drafting error.

We next consider the argument by Warberg and OOC that they are similarly situated to Waterstone and so should not have had their claims dismissed. Those plaintiffs contend that, while they were not parties to the warrants, any rights that the original investors had under the warrants flowed down to them and were properly pressed against defendant. This argument is based on the fact that the agreements effecting the transfers represented that the seller was assigning "any and all rights and benefits incident to the ownership" of the warrants. Plaintiffs further claim that the court erred in finding a novation, since the cancellation by defendant of the original warrants was merely ministerial.

Where an assignment grants the same rights and interests with regard to the claim to which the assignor had been entitled, "with all of its 'infirmities, equities and defenses,' " the assignee stands in the shoes of the assignor (*Madison Liquidity Invs. 119, LLC v Griffith*, 57 AD3d 438, 440 [1st Dept 2008]). This has been held to include a claim for reformation (*see Beck-Brown Realty Co. v Liberty Bell Ins. Co.*, 137 Misc 263 [Sup Ct, Kings County 1930]; *Stark v Masonic Life Assn.*, 180 NYS 235, 238 [Sup Ct, NY County 1920], *affd* 194 App Div 900 [1st Dept 1920]).

Based on the plain language of the purchase agreements to which Warberg and OOC were parties, any reformation claim that the original purchasers held was assigned to them, since it qualifies as one of the "rights and benefits incident to the ownership" of the warrants. We reject defendant's position that, at least for three of the seven Warberg/OOC transactions, the assignment was limited by language stating that the warrants were being conveyed "free and clear of all claims." That language does not limit the rights and benefits the buyers bargained for by stripping them of claims to protect those rights, but, in fact, protects the buyers by making clear that they were purchasing the warrants unencumbered by any claims with respect to title, such as competing "security interests, liens, pledges, claims (pending or threatened), charges, escrows."

The elements of a novation are a previously valid obligation, agreement of the parties to the new obligation, extinguishment of the old contract, and a valid new contract (*see Citigifts, Inc. v Pechnik*, 112 AD2d 832 [1st Dept 1985], *affd* 67 NY2d 774

[1986]; *Old Oak Realty v Polimeni*, 232 AD2d 536, 537 [2d Dept 1996]). "A novation will not discharge obligations created under a prior agreement unless it was so intended, and this question may be determined from the writings and conduct of the parties or, in certain cases, from the documents exclusively" (*Water St. Dev. Corp. v City of New York*, 220 AD2d 289, 290 [1st Dept 1995] [citations omitted], *lv denied* 88 NY2d 809 [1996]; *Blair & Co. v Carlos Otto V.*, 5 AD2d 276, 280 [1st Dept 1958]). The party claiming a novation has the burden of proof of establishing that it was the intent of the parties to effect a novation (*see Ventricelli v DeGennaro*, 221 AD2d 231, 232 [1st Dept 1995], *lv denied* 87 NY2d 808 [1996]).

We find that defendant presented no evidence that it and its counterparties intended to effectuate a novation before issuing warrants to Warberg and OOC. Defendant's argument that there was a novation is seriously undermined by the repeated references in the documents transferring the warrants to Warberg and OOC to an "assignment," and defendant's insistence that Warberg and OOC tender to it an "assignment form." By definition, a novation cannot exist where there is evidence that the rights existing under the purportedly cancelled agreement have been transferred or assigned to the other party. Further, we hesitate to find a novation upon the mere issuance of a new security, without any affirmative indication that the parties were changing the terms underlying the warrant being transferred. To do so would potentially have an outsize effect on the myriad assignments of securities that are effectuated on any given business day, extinguishing all the rights, obligations and defenses not apparent from the face of the certificates themselves. Concur—Richter, J.P., Mazzarelli, Kahn and Gesmer, JJ.