# United States Court of Appeals
## For the First Circuit

No. 19-2240

KETLER BOSSÉ,

Plaintiff, Appellee,

v.

NEW YORK LIFE INSURANCE COMPANY; NEW YORK LIFE INSURANCE AND
ANNUITY CORPORATION; NEW YORK LIFE INSURANCE COMPANY OF ARIZONA,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before[*]

Howard, Chief Judge,
Lynch and Barron, Circuit Judges.

Michael L. Banks, with whom David C. Dziengowski and Morgan,
Lewis & Bockius LLP were on brief, for appellants.
Robert M. Fojo, with whom Fojo Law, P.L.L.C. was on brief,
for appellee.

---

[*]     Judge Torruella heard oral argument in this matter and
participated in the semble, but he did not participate in the
issuance of the panel's opinion in this case.  Chief Judge Howard
was substituted for Judge Torruella on the panel pursuant to
Internal Operating Procedure VII(D)(4).  Chief Judge Howard read
the briefs, reviewed the record, and listened to the audio
recording of oral argument.

March 30, 2021

**LYNCH**, **Circuit Judge**.  The district court refused to enforce arbitration clauses in the Employment Agreement between Ketler Bossé and New York Life, which expressly require that any disputes about arbitrability be referred to the arbitrator to decide.  The Supreme Court decisions in Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524 (2019), First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995), and other cases result in our reversing that decision because the decision on whether the dispute is arbitrable belongs to the arbitrator and not to the court.

Bossé had a continuous business relationship with New York Life for about fifteen years, during which time he worked both as an independent contractor and, from 2004 to 2005, as an employee.  In 2016, New York Life terminated its business relationship with Bossé.

Bossé brought this action in federal court alleging race discrimination by New York Life in violation of 42 U.S.C. §§ 1981 and 1985 and other claims under state law.  In response, New York Life invoked the arbitration clauses contained in Bossé's Employment Agreement, which state "[t]he Partner and New York Life agree that any dispute, claim or controversy arising between them, including those alleging employment discrimination (including sexual harassment and age and race discrimination) in violation of a statute (hereinafter 'the Claim'), as well as any dispute as to

- 3 -

whether such Claim is arbitrable, shall be resolved by [] arbitration." New York Life said the arbitration clauses survived under an explicit "Survival" clause in the parties' Employment Agreement and asked the court to compel arbitration and stay or dismiss the lawsuit.

The district court refused to do either. We hold that the district court's reasoning contravened the holdings in Supreme Court decisions. The clause delegating all disputes about arbitrability is clear, unmistakable, and unambiguous. It should have been enforced on those terms. And even if there were any ambiguity, and we see none, the presumption in favor of arbitrability would lead to the same result. Reversal is required under the Federal Arbitration Act ("FAA") and Supreme Court opinions interpreting the FAA, and none of Bossé's other arguments would permit affirmance.

I.

A.  Facts

Because this appeal arises from an order on a motion to stay proceedings and to compel arbitration in connection with a motion to dismiss, "we draw the relevant facts from the complaint and the parties' submissions to the district court on the motion." Biller v. S-H OpCo Greenwich Bay Manor, LLC, 961 F.3d 502, 505 n.2 (1st Cir. 2020) (internal quotation marks omitted) (quoting Bekele v. Lyft, Inc., 918 F.3d 181, 184 (1st Cir. 2019)).

- 4 -

## 1. Bossé Is Hired as an Agent

Bossé began his business relationship with New York Life in 2001 when he was hired as an agent. Bossé believes he was the first black agent hired by New York Life in New Hampshire and remained the only black agent working in New Hampshire as late as 2012.

Under the terms of the Agent's Contract, which he executed with New York Life on November 15, 2001, Bossé was authorized to solicit applications for various life and health insurance and annuity policies, for which he earned commissions. He, however, did not remain an agent but was promoted.

## 2. The Partner's Employment Agreement

On March 25, 2004, Bossé entered into a Partner's Employment Agreement ("the Employment Agreement" or "the Agreement") with New York Life.[1] It is the terms of this Employment Agreement that are at issue. The first line in the Employment Agreement specifically identifies "KETLER BOSSE" as "PARTNER," and below that the Agreement states "NEW YORK LIFE INSURANCE COMPANY hereby authorizes the employment of the person named above as Partner." The signature line at the end of the Agreement, on which Bossé signed, is designated as "Partner Signature." It is

---

[1] The Agreement contains a choice-of-law provision stating that it "shall be governed by and interpreted in accordance with" New York state law.

undisputed that when Bossé entered the Employment Agreement, he was a Partner.  Under that Agreement, Bossé was paid a salary and given the responsibility to recruit, to train, and to supervise agents under the direction of a Managing Partner.

The Employment Agreement included an arbitration clause, which specifies that

> [t]he Partner and New York Life agree that any dispute, claim or controversy arising between them, including those alleging employment discrimination (including sexual harassment and age and race discrimination) in violation of a statute (hereinafter "the Claim"), as well as any dispute as to whether such Claim is arbitrable, shall be resolved by an arbitration proceeding administered by the [National Association of Securities Dealers ("NASD")] in accordance with its arbitration rules.

The arbitration clause also provides that

> [i]n the event that the NASD refuses to arbitrate the Claim, the Partner and New York Life agree that the Claim, as well as any dispute as to whether such Claim is arbitrable, shall be resolved by an arbitration proceeding administered by the American Arbitration Association [("AAA")] in accordance with its National Rules for the Resolution of Employment Disputes [("NRRED")].

As specified in the text, such disputes must be resolved under certain specified rules.  We highlight those rules.  The NASD referenced in the arbitration clause has been succeeded by the Financial Industry Regulatory Authority ("FINRA") and it is undisputed that the reference to the NASD rules should be read as

incorporating the FINRA rules. FINRA Rule 13413 provides that "[t]he panel has the authority to interpret and determine the applicability of all provisions under the Code [of Arbitration Procedure for Industry Disputes]."[2] Rule 6 of the AAA Employment Arbitration Rules and Mediation Procedures (formally named the NRRED) states that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement" and shall also "have the power to determine the existence or validity of a contract of which an arbitration clause forms a part."[3]

Finally, the Agreement contains a "Survival" clause, which provides that various provisions of the contract "shall survive termination of this . . . Employment Agreement by either party for any reason." The arbitration clause is one of those

---

[2]     13413. Jurisdiction of Panel and Authority to Interpret the Code, FINRA (Dec. 15, 2008), https://www.finra.org/rules-guidance/rulebooks/finra-rules/13413.

[3]     Am. Arb. Ass'n, Employment Arbitration Rules and Mediation Procedures 12 (2009), https://www.adr.org/sites/default/files/EmploymentRules_Web2119.pdf. Rule 1 notes that "[a]ny arbitration agreements providing for arbitration under [the NRRED] shall be administered pursuant to these Employment Arbitration Rules and Mediation Procedures." Id. at 10. In addition, the introduction to these rules and procedures states that they were developed for arbitration agreements contained in employment agreements, independent contractor agreements, and other types of workplace agreements. Id. at 9.

provisions the parties expressly provided would survive termination of the Agreement.

### 3. Bossé's Subsequent Work as an Agent and District Agent and the Alleged Race Discrimination

At some point in 2005, Bossé transitioned back to working as a contractor with New York Life under the Agent's Contract. That contract did not contain an arbitration clause. He worked with New York Life in that capacity until 2013, when he became a District Agent.

Under the District Agent Agreement, Bossé was authorized to establish his own firm separate from New York Life's general office, at his own expense, and to hire his own agents, and he had other responsibilities in addition to his normal duties as an agent. The District Agent Agreement explicitly stated that District Agents are "independent contractor[s] for all purposes" and that it "does not and will not be construed to create the relationship of employer and employee between New York Life and [the] District Agent." The District Agent Agreement did not contain an arbitration clause.

On January 15, 2016, Bossé was terminated from his business relationship with New York Life pursuant to the at-will employment provision in his Agent's Contract. He alleges he was told he was being terminated because he had provided false or inaccurate information in processing an electronic life insurance

- 8 -

application for his ex-wife. Bossé denies any such misconduct and asserts that the purported reason for his termination was pretextual and that the real reason for his termination was his race.

Generally, Bossé contends that New York Life and specific employees undermined his relationships with his customers and his agents in various ways. Bossé claims that he complained of this misconduct to New York Life employees on several occasions from 2013 to 2015, but that no action was taken to address it. He asserts that white agents were not subject to this mistreatment and that it constituted a pattern and practice of discrimination because of his race and because he had recruited many minority agents to his unit. Bossé alleges that he was the first and only black District Agent hired by New York Life at the time his business relationship with the defendants ended and that New York Life generally failed to hire black agents.

B.  Procedural History

On February 12, 2016, Bossé filed a charge of racial discrimination and retaliation with the New Hampshire Commission for Human Rights ("the Commission"). New York Life defended that charge by producing to the Commission a copy of the Agent's Contract, which established that Bossé was an independent contractor, rather than an employee, at the time of the alleged misconduct. The Commission thus dismissed the charge for lack of

jurisdiction.  New York Life did not argue to the Commission that the charge of discrimination was subject to binding arbitration and should have been dismissed on that basis.

On January 7, 2019, Bossé filed a complaint against New York Life Insurance Company, New York Life Insurance and Annuity Corporation, and New York Life Insurance Company of Arizona (collectively "New York Life") in federal court in New Hampshire. He brought claims for race discrimination and retaliation under 42 U.S.C. §§ 1981 and 1985, as well as various claims under New Hampshire state law.  In response to that complaint, New York Life requested that Bossé dismiss the federal case and proceed to arbitration.  Bossé refused.

On April 9, 2019, New York Life filed a motion to dismiss or, in the alternative, to stay proceedings and to compel arbitration pursuant to Sections 3 and 4 of the FAA.[4]  9 U.S.C. §§ 3-4.  It argued that New York Life and Bossé had a valid agreement "that any dispute, claim or controversy arising between them, . . . as well as any dispute as to whether such Claim is arbitrable, shall be resolved by [] arbitration."  New York Life argued that the arbitration clauses survived the termination of

---

[4]  New York Life's motion also sought to dismiss Count III of the complaint for "Conspiracy to Interfere with Civil Rights" in violation of 42 U.S.C. § 1985.  The district court's decision as to that portion of the motion is not before us on appeal.

- 10 -

the Employment Agreement and that Bossé's claims fell within the scope of the broad arbitration clauses. We refer to the arbitration clauses rather than a single clause because under the "Arbitration" heading in the Agreement there are separate provisions in separate paragraphs. New York Life argued that under the clauses, any disputes about the scope of the agreement to arbitrate were explicitly assigned to the arbitrator to determine. Bossé opposed New York Life's motion.

On November 13, 2019, the district court denied New York Life's motion to stay proceedings and to compel arbitration. Bossé v. N.Y. Life Ins. Co., No. 19-cv-016-SM, 2019 WL 5967204, at *6 (D.N.H. Nov. 13, 2019). The district court determined that the question of whether these disputes fell within the arbitration clauses was for it to resolve and not the arbitrator. See id. at *4-5. It concluded that the language of the arbitration agreement presented an issue of contract formation under New York state law. See id. It also held that Section 2 of the FAA "itself requires that an arbitration clause have some relationship to, some connection with, the agreement or contract, as a condition of federal enforcement." Id. at *5. Finding no such relationship between the Employment Agreement and Bossé's claims here, the

district court refused to enforce the arbitration clauses.[5]  Id. at *6.

New York Life timely appealed.

## II.

We have jurisdiction over an interlocutory appeal of a denial of a motion to stay proceedings or to compel arbitration. Marie v. Allied Home Mortg. Corp., 402 F.3d 1, 6 (1st Cir. 2005) (citing 9 U.S.C. § 16(a)(1)).  Given the legal nature of the issues involved, we review the denial of the motion to stay proceedings and to compel arbitration de novo.  Id. at 9.  "To compel arbitration, the defendants 'must demonstrate [(1)] that a valid agreement to arbitrate exists, [(2)] that the[y are] entitled to invoke the arbitration clause, [(3)] that the other party is bound by that clause, and [(4)] that the claim asserted comes within the clause's scope.'"  Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 6 (1st Cir. 2014) (third alteration in original) (quoting Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011)).

---

[5]  The district court also concluded that New York Life's interpretation of the survival clause contravened public policy by impermissibly extending the statute of limitations.  Id. at *6. Bossé does not defend this aspect of the district court's decision on appeal.  Nor is the district court's reasoning on that point persuasive.  The survival clause does not change the limitations period for any particular claim, but rather provides that all claims must be brought in a specific forum, even after termination of the Employment Agreement.  And there is no statute of limitations for enforcement of an arbitration agreement.

A.  The District Court Erred in Not Referring Disputes as to the Arbitrability of the Claims to the Arbitrator

    1.  Disputes as to the Arbitrability of the Claims Are Clearly, Unmistakably, and Unambiguously Delegated to the Arbitrator

It is well-settled that arbitration is a matter of contract.[6]  See, e.g., Lamps Plus, Inc. v. Varela, 139 S. Ct. 1407, 1415-16 (2019); Granite Rock Co. v. Int'l Brotherhood of Teamsters, 561 U.S. 287, 296-97, 299 (2010); First Options, 514 U.S. at 943. The Supreme Court has made clear that where the parties have agreed to arbitrate, the FAA requires "courts [to] 'rigorously enforce' arbitration agreements according to their terms."  Am. Express Co. v. Italian Colors Rest., 570 U.S. 228, 233 (2013) (quoting Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 221 (1985)); see also Lamps Plus, 139 S. Ct. at 1412, 1416.

That applies to the enforcement of delegation clauses.[7] In Henry Schein, the Supreme Court emphasized that where the

_____

    [6]    "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."  First Options, 514 U.S. at 944.

    [7]    We refer to an agreement to submit issues of arbitrability to the arbitrator -- like the agreement at issue here -- as a "delegation clause."  A delegation clause "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."  Henry Schein, 139 S. Ct. at 529 (quoting Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 70 (2010)).

- 13 -

parties "by clear and unmistakable evidence" delegate issues of arbitrability to the arbitrator, "the courts must respect the parties' decision as embodied in the contract" and send the issue to the arbitrator to decide. 139 S. Ct. at 528, 530 (internal quotation marks omitted) (quoting First Options, 514 U.S. at 944); see also AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986). It held that a court cannot decide the arbitrability question in such circumstances because that court "thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." Henry Schein, 139 S. Ct. at 529. Where there is a clear and unmistakable delegation of arbitrability issues, the court's proper inquiry "before referring a dispute to an arbitrator" is limited to "determin[ing] [(1)] whether a valid arbitration agreement exists . . . [b]ut [(2)] if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." Id. at 530 (citing 9 U.S.C. § 2).[8]

Henry Schein builds on the Supreme Court's earlier decisions, which reinforce this rule. "[C]ourts should order

_____

[8] The Court in Henry Schein remanded for the court of appeals to determine whether there was clear and unmistakable evidence of delegation in that case. See id. at 531. The Fifth Circuit on remand concluded there was no such clear and unmistakable evidence of delegation. Archer & White Sales, Inc. v. Henry Schein, Inc., 935 F.3d 274, 281-82 (5th Cir. 2019).

- 14 -

arbitration of a dispute only where the court is satisfied that neither [(1)] the formation of the parties' arbitration agreement nor [(2)] (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." Granite Rock, 561 U.S. at 299 (second emphasis added) (citing First Options, 514 U.S. at 943); see also id. at 301, 303.

Bossé does not argue that the arbitration agreement was invalidly formed. Nor does he challenge the validity or formation of the delegation clause specifically.[9] Rather, he asserts that the arbitration agreement and the delegation clause do not apply to his particular claims. The district court reasoned that the issue was for it, not the arbitrator, to decide and then determined the issue, in agreement with Bossé.[10] See Bossé, 2019 WL 5967204, at *4-5.

---

[9] The dispute about the delegation clause clearly does not undermine the formation or the validity of the agreements to arbitrate. See Grand Wireless, 748 F.3d at 8 (enforcing an arbitration agreement with broad language); see also Lamps Plus, 139 S. Ct. at 1412, 1416; Italian Colors Rest., 570 U.S. at 233.

[10] The district court's reliance on Wexler v. AT & T Corp., 211 F. Supp. 3d 500 (E.D.N.Y. 2016), in support of the proposition that there was no enforceable agreement to arbitrate these particular claims is misplaced. The court in Wexler held that an unlimited arbitration clause presents an issue of contract formation for lack of mutual intent to be bound and that the arbitration agreement at issue was not enforceable for that reason. Id. at 504-05. Bossé does not contend that the arbitration agreement or the delegation clause were not validly formed or that they are generally unenforceable.

We hold that the text of the parties' agreement clearly, unmistakably, and unambiguously delegates the arbitrability dispute at issue here to the arbitrator. The district court erred in not enforcing that agreement according to its own language and in not referring the dispute about whether Bossé's claims are arbitrable to the arbitrator.

First, the text of the arbitration agreement contains an express delegation clause. The arbitration agreement states that "[t]he Partner and New York Life agree that any dispute, claim or controversy arising between them, including those alleging employment discrimination (including . . . race discrimination) in violation of a statute [()'the Claim'), as well as any dispute as to whether such Claim is arbitrable, shall be resolved by [] arbitration." The term "such Claim" is a defined term which refers to "any dispute, claim or controversy arising between them." Thus, the delegation clause provides that "any dispute as to whether [any dispute, claim or controversy arising between them] is arbitrable, shall be resolved by [] arbitration." There is no language in that text that carves out from its application a

<hr>

Moreover, the situation in Wexler is quite different from that here. Unlike the customers who "check[ed] a box accepting the 'terms and conditions' necessary to obtain cell phone service," id. at 504, Bossé is a sophisticated party who had an ongoing business relationship with New York Life and who submitted no evidence that he did not understand the terms of the arbitration agreement, the delegation clause, or the survival clause.

particular type of claim or dispute. It is not the role of the court to rewrite the parties' contract. See Lamps Plus, 139 S. Ct. at 1412, 1416; Italian Colors Rest., 570 U.S. at 233.

Second, the Employment Agreement also contains other text indicating the parties' clear and unmistakable intent in addition to the text of the express delegation clause. The arbitration clauses provide that "[t]he Partner and New York Life agree that any dispute, claim or controversy arising between them, . . . as well as any dispute as to whether such Claim is arbitrable, shall be resolved by an arbitration proceeding administered by the NASD in accordance with its arbitration rules" and that "[i]n the event that the NASD refuses to arbitrate the Claim, the Partner and New York Life agree that the Claim, as well as any dispute as to whether such Claim is arbitrable, shall be resolved by an arbitration proceeding administered by the [AAA] in accordance with its [arbitration rules]." Rule 6(a) of the AAA Employment Arbitration Rules and Mediation Procedures explicitly gives the issue of whether claims are arbitrable to the arbitrator to decide. That rules states that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." This Court is clear that incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence of the parties' intent to delegate arbitrability issues to the

arbitrator.  <u>Awuah</u> v. <u>Coverall N. Am., Inc.</u>, 554 F.3d 7, 11-12 (1st Cir. 2009).

Other text in the Employment Agreement mandates our result.  The survival clause reinforces the parties' intent that issues of arbitrability be decided by an arbitrator even after that Agreement was terminated.  See <u>Breda</u> v. <u>Cellco P'ship</u>, 934 F.3d 1, 7 (1st Cir. 2019); <u>see also</u> <u>Litton Fin. Printing Div.</u> v. <u>NLRB</u>, 501 U.S. 190, 205-06 (1991).  Bossé largely ignores the survival clause in his briefing, instead arguing that the clause is "irrelevant."  The clause is not irrelevant.[11]

The cases which Bossé cites in support of his argument that there is no clear and unmistakable evidence of delegation of the arbitrability dispute here are factually distinguishable. None involves an express delegation clause, and several involve

---

[11]  Bossé does not explicitly argue that there was a novation which superseded the Employment Agreement and the issue is waived. Even if we were to bypass that waiver, we conclude the argument fails.

Under New York law, "[t]he party claiming a novation has the burden of proof of establishing that it was the intent of the parties to effect a novation." <u>Grimaldi</u> v. <u>Sangi</u>, 113 N.Y.S.3d 771, 774 (N.Y. App. Div. 2019) (quoting <u>Warberg Opportunistic Trading Fund L.P.</u> v. <u>GeoResources, Inc.</u>, 58 N.Y.S.3d 1, 8 (N.Y. App. Div. 2017)). Bossé has presented no evidence that the parties intended to extinguish the obligations under the Employment Agreement when they entered into the two subsequent agreements, and the inclusion of the survival clause in the Employment Agreement belies the notion that New York Life intended the subsequent agreements between it and Bossé to terminate the earlier arbitration agreement.

arbitration agreements that had only an incorporation of an arbitral forum's arbitration rules or included a provision expressly carving out certain types of claims or disputes. See First Options, 514 U.S. at 940-41 (no express delegation clause); Archer & White Sales, Inc. v. Henry Schein, Inc., 935 F.3d 274, 277-82 (5th Cir. 2019) (no express delegation clause, only an incorporation of AAA arbitration rules, carve-out provision for certain actions and disputes); NASDAQ OMX Grp., Inc. v. UBS Sec., LLC, 770 F.3d 1010, 1016, 1031-32 (2d Cir. 2014) (same); Turi v. Main St. Adoption Servs., LLP, 633 F.3d 496, 506-07, 510 (6th Cir. 2011) (very narrow arbitration agreement, no express delegation clause, only an incorporation of AAA arbitration rules), abrogated by Henry Schein, 139 S. Ct. at 529.[12]

Bossé also argues that the court must assess whether the particular dispute falls within the scope of the arbitration

---

[12]    Turi, one of the cases on which Bossé relies -- and which was explicitly abrogated by Henry Schein -- applied a version of the "wholly groundless exception" that is quite similar to the reasoning the district court applied in this case. See Turi, 633 F.3d at 511 (holding "that even where the parties expressly delegate to the arbitrator the authority to decide the arbitrability of the claims related to the parties' arbitration agreement, this delegation applies only to claims that are at least arguably covered by the agreement"), abrogated by Henry Schein, 139 S. Ct. at 529.
    The other cases Bossé cites are inapposite because they do not involve nor discuss the applicability of a survival clause to an arbitration agreement. See Bogen Commc'ns, Inc. v. Tri-Signal Integration, Inc., 227 F. App'x 159, 160-62 (3d Cir. 2007); Vantage Techs. Knowledge Assessment, LLC v. Coll. Entrance Examination Bd., 591 F. Supp. 2d 768, 770-72 (E.D. Pa. 2008).

agreement to determine whether the arbitrability of that dispute was delegated to the arbitrator. He argues the question of the scope of the delegation clause is distinct from but related to the scope of the arbitration agreement. His attempted atomization of the arbitrability question is prohibited by the Supreme Court's reasoning in Henry Schein. The question of the scope of the delegation clause cannot be separated from the question of the scope of the arbitration agreement as a whole here. His argument has it backwards.

The delegation clause uses the term "such Claim," which is a defined term that refers to "any dispute, claim or controversy arising between them." That term also establishes the scope of the arbitration agreement as a whole. Because of the incorporation of this defined term into the delegation clause, any decision as to whether a dispute falls within the scope of the delegation clause necessarily decides whether it falls within the scope of the arbitration agreement. Bossé's reasoning is thus circular: it requires the court to consider for itself whether a particular claim falls within the scope of the arbitration agreement and delegation clause in order to determine whether the dispute should be submitted to the arbitrator to determine its arbitrability. At that point, the arbitrability question has already been answered by the court, and the delegation clause here is rendered

meaningless.[13]  This is precisely the type of "short-circuit[ing] [of] the process" which concerned the Supreme Court in Henry Schein.  139 S. Ct. at 527.  It is merely an application of the "wholly groundless exception" under a different guise.  See id. at 528-31.

Finally, Bossé contends, and the district court determined, that Section 2 of the FAA requires that an arbitration clause have some relationship or connection to the underlying contract to be enforceable, which the clauses purportedly lacked with respect to Bossé's claims here.[14]  We have found no Supreme Court or circuit case law -- and Bossé has not directed us to any

---

[13]  Not only does this reasoning contravene the Supreme Court's holding in Henry Schein, but it also violates the principle of New York state contract law that a "contract should be construed so as to give full meaning and effect to all its provisions." PaineWebber Inc. v. Elahi, 87 F.3d 589, 600 (1st Cir. 1996) (quoting Am. Express Bank Ltd. v. Uniroyal, Inc., 562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1990), leave to appeal denied, 572 N.E.2d 52 (N.Y. 1991)).

[14]  Section 2 of the FAA provides that

> [a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

-- which supports his contention regarding the "arising out of" language in Section 2 of the FAA.[15]

2. Even Were There Some Purported Ambiguity, the Presumption in Favor of Arbitrability Also Requires that This Dispute as to the Arbitrability of the Claims Be Referred to the Arbitrator to Decide

The FAA reflects a "liberal federal policy favoring arbitration agreements," Oliveira v. New Prime, Inc., 857 F.3d 7, 12 (1st Cir. 2017) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)), in which there is a presumption that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25; see also Granite Rock, 561 U.S. at

---

[15] This Court has dealt with cases involving arbitration agreements which explicitly include language requiring the claim or dispute to "arise out of" or "relate to" the underlying contract of which the arbitration agreement is a part. See, e.g., Biller, 961 F.3d at 506; Breda, 934 F.3d at 5; Grand Wireless, 748 F.3d at 4. But in those cases, the limitation on the sorts of arbitrable disputes covered by the arbitration agreement was the result of contract rather than Section 2 of the FAA.

This Court has also discussed the effect of Section 2's language indirectly in dicta, but has not explicitly held that language imposes an independent requirement on the federal enforceability of arbitration agreements. See Local 205, United Elec., Radio & Mach. Workers of Am. (UE) v. Gen. Elec. Co., 233 F.2d 85, 98 (1st Cir. 1956) (suggesting, in dicta, that a collective bargaining agreement may fall outside the scope of Section 2 of the FAA if the arbitration clause in the collective bargaining agreement were not limited to controversies "arising out of such contract or transaction"), aff'd by 353 U.S. 547 (1957); see also Kristian v. Comcast Corp., 446 F.3d 25, 33 (1st Cir. 2006) (holding that, as a matter of contract interpretation, an arbitration clause applied retroactively to a dispute over services provided which did not arise out of the agreement, but not considering the separate FAA issue).

301-03; First Options, 514 U.S. at 944-45. The Supreme Court in First Options made clear that where an agreement to arbitrate some issues exists, and there is a dispute over the scope of the arbitration agreement, the law requires that those matters be presumed to be arbitrable "unless it is clear that the arbitration clause has not included them." 514 U.S. at 945 (internal quotation marks omitted) (quoting G. Wilner, 1 Domke on Commercial Arbitration § 12.02, at 156 (rev. ed. Supp. 1993)).

Even if there were some ambiguity, under First Options we apply the presumption in favor of arbitrability in determining the scope of the delegation clause. Given the broad language of the arbitration agreement and delegation clause, together with the survival clause, there is enough of a textual hook to conclude that Bossé certainly has not made it clear the delegation clause here does not include this particular arbitrability dispute. See First Options, 514 U.S. at 945. This dispute as to the arbitrability of his claims should have been referred to the arbitrator for this additional reason.[16]

---

[16] Even if there were ambiguity about whether the term "Partner" encompasses Bossé specifically, or merely refers generally to a person then in the position of "Partner," or whether the arbitration agreement is limited to claims arising out of Bossé and New York Life's employment relationship, those disputes also go to the arbitrator because they involve a question of the scope of the arbitration agreement.

B.  New York Life Did Not Forfeit Its Rights Under Either the
    Doctrine of Judicial Estoppel or Waiver

Bossé also asserts that New York Life forfeited its right to arbitrate his claims as a result of both judicial estoppel and waiver.  The district court did not address these arguments.  We address them because they are quintessentially legal issues and no further development of the record is needed to resolve them.  See United States v. Kin-Hong, 110 F.3d 103, 116 (1st Cir. 1997).  We find neither argument persuasive.

Bossé argues that New York Life should be judicially estopped from and that it has waived any ability to compel arbitration because it did not assert its right to arbitrate during the proceedings before the New Hampshire Commission for Human Rights.  New York Life defended those proceedings by submitting a copy of Bossé's Agent's Contract to support its argument that he was not an employee at the time of the alleged misconduct and the Commission lacked jurisdiction over his claims.

"[T]he doctrine of judicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding."  InterGen N.V. v. Grina, 344 F.3d 134, 144 (1st Cir. 2003) (citing Pegram v. Herdrich, 530 U.S. 211, 227 n.8 (2000)).  It "is designed to ensure that parties proceed in a fair and aboveboard manner, without

- 24 -

making improper use of the court system." Id. (citing New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001)). There are two elements to a claim of implied waiver of the right to arbitrate through inaction: (1) "undue delay" and (2) "a modicum of prejudice to the other side." Rankin v. Allstate Ins. Co., 336 F.3d 8, 12 (1st Cir. 2003); see also Marie, 402 F.3d at 15.

There is no inconsistency and no undue delay from New York Life asserting the jurisdictional defense to the Commission, rather than invoking the arbitration agreement. The Commission was a third party not bound by the terms of the arbitration agreement. See Marie, 402 F.3d at 15. There is no issue before us as to whether the Commission had jurisdiction, and it certainly was not unfair or improper for New York Life to assert this jurisdictional defense.

### III.

On remand, the district court must enter an order compelling arbitration and issue a stay upon sending the matter to the arbitrator pursuant to 9 U.S.C. §§ 3 and 4. See Marie, 402 F.3d at 17.

Reversed and remanded. No costs are awarded.


**-Dissenting Opinion Follows-**

- 25 -

**BARRON**, <u>Circuit Judge</u>, **dissenting**. Under the terms of the "Employment Agreement," "[t]he Partner and New York Life" plainly agreed that "any dispute, claim or controversy arising between them, including those alleging employment discrimination (including sexual harassment and age and race discrimination) in violation of a statute (hereinafter 'the Claim') . . . shall be resolved by [] arbitration." Thus, they agreed that "<u>the Claim</u>" -- defined as "any dispute, claim or controversy arising between them" -- "shall be resolved by [] arbitration." (emphasis added). But, what does "the Claim" encompass? Does it encompass even a lawsuit that seeks recovery based on alleged actionable misconduct by New York Life that first occurred only after the Partner who signed the Employment Agreement was no longer a Partner at all?

If the Employment Agreement said nothing more than what I have just quoted from it, then it would be clear that the parties had left the answer to that question about the meaning of "the Claim" -- and, thus, about the scope of the arbitration agreement that they had reached -- to a court to resolve. But, the majority points out, the Employment Agreement also contains what is known as a delegation clause, which operates as an ancillary agreement to arbitrate certain specified matters concerning arbitrability. <u>See</u> <u>Henry Schein, Inc.</u> v. <u>Archer & White Sales, Inc.</u>, 139 S. Ct. 524, 529 (2019). And, that delegation clause provides that "[t]he

Partner and New York Life agree that . . . any dispute as to whether such Claim is arbitrable[] shall be resolved by [] arbitration."

The majority holds that the inclusion of this delegation clause in the Employment Agreement is dispositive of this appeal, because that clause is best construed to delegate to an arbitrator the question of the meaning of "Claim" in the arbitration agreement itself and thus the question of whether that term covers the race discrimination suit that Ketler Bossé brings. Thus, the majority concludes that the District Court erred in construing the scope of the arbitration agreement not to encompass Bossé's suit, because the question of whether the arbitration agreement encompasses that suit was for an arbitrator and not for the District Court to decide.

I cannot agree with that conclusion. It derives from a superficially plausible but, in my view, ultimately textually untenable construction of the delegation clause. Nor can I agree with New York Life's contention that, even if the parties to the Employment Agreement did not agree to delegate the question regarding the scope of the arbitration agreement to an arbitrator to resolve, the District Court erred in resolving that question as it did. I thus write separately to explain why I would affirm the District Court's ruling.

**I.**

There is no doubt that it would have been possible for Bossé and New York Life to have drafted an employment contract back in 2004 that would have contained both a delegation clause and an arbitration agreement that would have, in combination, sought to ensure that an arbitrator rather than a court would decide whether any future lawsuit between them -- no matter how far in the future the actionable conduct on which it would be based would have first occurred -- was the type of lawsuit that they had agreed to resolve through arbitration. But, the Employment Agreement that they actually wrote does not contain a delegation clause that assigns such a question of the scope of the arbitration agreement to an arbitrator.

In concluding otherwise, the majority describes the delegation clause as if it were one that "expressly require[s] . . . any disputes about arbitrability [to] be referred to the arbitrator to decide." Maj. Op. at 3. I do not dispute that if this were what the delegation clause required, then the question of the arbitration agreement's scope would have been delegated to an arbitrator such that a court could not decide it -- just as the majority holds. The words "any disputes about arbitrability" in the majority's restated version of the delegation clause plainly encompass disputes about the scope of the arbitration agreement.

But, the words that the delegation clause actually uses are not the ones that the majority deploys in its shorthand account of what that clause "expressly require[s]." And, that shorthand account fails properly to account for the words "such Claim" that figure so prominently in the delegation clause.

That is not to say that the majority makes no attempt to account for those two words in explaining why its paraphrase of the delegation clause is accurate. It explains that the paraphrase is revealed to be accurate if one substitutes for the words "such Claim" in the delegation clause the definition of "the Claim" that the arbitration agreement sets forth: "any dispute, claim or controversy arising between them." See id. at 16-17.

According to the majority, such a substitution produces a delegation clause that provides that "any dispute as to whether [any dispute, claim or controversy arising between them] is arbitrable, shall be resolved by [] arbitration." Id. at 16. For that reason, the majority concludes, the plain text of the delegation clause ensures that "any dispute" between the parties to the Employment Agreement over the meaning of the scope of the arbitration agreement is for an arbitrator and not a court to decide. After all, the majority contends, a "dispute" over the meaning of "the Claim" in the arbitration agreement is itself obviously a "dispute" between the parties, such that the plain

text of the delegation clause necessarily encompasses it once the substitution described above is made.  See id.

But, this purportedly plain text reading of the delegation clause fails to grapple with the use in that clause of the word "such," which modifies the key word "Claim."  This failure is of concern, because the word "such," as a matter of grammar, ensures that the word in the delegation clause that it modifies -- "Claim" -- can be no more encompassing than the word "Claim" in the arbitration agreement to which the word "such" refers.  See, e.g., United States v. Bowen, 100 U.S. 508, 512 (1879) (finding that "the qualifying word such . . . restricted" the referent to the "class" of individuals "described in the sentence which immediately precede[d] it"); Littlefield v. Mashpee Wampanoag Indian Tribe, 951 F.3d 30, 37 (1st Cir. 2020) (quoting Webster's New International Dictionary, according to which the word "such" means among other things "of the sort or degree previously indicated or contextually implied," and concluding that "[n]ormal usage in the English language would read the word 'such' as referring to the entire antecedent phrase" (emphasis added)); United States v. Ahlers, 305 F.3d 54, 59-61 (1st Cir. 2002) (finding that the use of the word "such" in 18 U.S.C. § 3553(e) "plainly refers back to" the entire antecedent phrase and thus "retains . . . a reference point" that is "specific[ and] carefully circumscribed").

Thus, the simple substitution that the majority makes, in which it swaps out the words "such Claim" in the delegation clause for the words that the arbitration agreement uses to define "the Claim" in that clause, is more than a mere substitution. It is an alteration -- subtle but crucial -- in the meaning of the delegation clause.

The arbitration agreement in using the words "any dispute, claim or controversy arising between them" to define "the Claim" is necessarily referring only to the class of "dispute[s], claim[s] or controvers[ies]" that the arbitration agreement itself encompasses. And, that is a class of "disputes" -- to use a shorthand for what it includes -- that obviously does not itself encompass disputes about the arbitrability of those disputes. Indeed, were that not the case, the delegation clause that is the majority's focus would be superfluous. Thus, that class does not itself encompass the particular dispute over arbitrability that is at issue here, which concerns the scope of that very class, because the arbitration agreement is not the place to look for an agreement to arbitrate about arbitrability -- only the delegation clause is, as the majority's own focus on that delegation clause to determine whether it encompasses this dispute over arbitrability implicitly acknowledges.

It is no objection to this more modest construction of the delegation clause's scope, in my view, that it limits the range

of disputes about arbitrability that the clause encompasses to fewer than all possible disputes about arbitrability. A delegation clause need not delegate every issue of arbitrability, as the parties are free to decide between themselves which, if any, issues of arbitrability they wish for an arbitrator to resolve.

Nor is this a case in which a limited reading of the delegation clause renders that clause useless. Although the word "such" plainly limits the reach of the delegation clause for the reasons that I have explained, the clause still clearly and unmistakably assigns to an arbitrator the resolution of disputes over whether the class of "dispute[s], claim[s] or controvers[ies]" that the arbitration agreement covers -- whatever that class encompasses in terms of scope -- are "arbitrable." And, those delegated questions of arbitrability are hardly trivial ones. They concern such potentially dispositive questions regarding the enforceability of the arbitration agreement as whether it is valid in the face of defenses like unconscionability or mutual mistake.

Thus, the supposedly plain text reading of the delegation clause that undergirds the majority's holding is in my view simply mistaken, because the text refutes it. Indeed, if, as the majority concludes, the parties had intended the question of the arbitration agreement's scope to be itself decided through arbitration, then the delegation clause would have had to provide

for a delegation along the lines of:  "The Partner and New York Life agree that any dispute as to whether such Claim is arbitrable as well as any dispute as to what constitutes 'such Claim' shall be resolved by arbitration."  Or it could have used the more economical phrasing that the majority's shorthand account of the delegation clause uses.  But, of course, the delegation clause was not written in a manner that uses either formulation, and so does not expressly require that a dispute over the scope of "Claim" in the arbitration agreement be resolved by an arbitrator.  Instead, it expressly requires only that "any dispute as to whether such Claim is arbitrable[] shall be resolved by [] arbitration."

The majority does suggest that the more limited construction of the delegation clause that I conclude is required renders the arbitral provisions of the Employment Agreement hopelessly circular.  See Maj. Op. at 20-21.  But, I do not see how that is so.

I quite agree that it is sensible to presume that the parties who draft contracts do so more after the fashion of Bob Ross than M.C. Escher.  There is nothing circular, however, about a delegation clause that requires a court to first determine the scope of "the Claim" in the arbitration agreement before enforcing the putative delegation clause.  Contrary to the majority's assertion, such a delegation clause simply reflects the fact that the parties who drafted it intended that it would encompass only

- 33 -

those disputes that concern the arbitrability of the class of "dispute[s], claim[s] or controvers[ies]" that the arbitration agreement itself encompasses and not disputes over what that class encompasses.

The majority does also attempt to support its construction of the delegation clause by pointing to the fact that the Employment Agreement incorporates the American Arbitration Association's ("AAA's") National Rules for the Resolution of Employment Disputes ("NRRED"). It contends that this incorporation "constitutes clear and unmistakable evidence of the parties' intent to delegate arbitrability issues to the arbitrator." Maj. Op. at 17-18. That is so, according to the majority, because Rule 6(a) of the NRRED provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." See id. at 17.

But, the Employment Agreement is clear that the AAA will only administer the arbitration proceeding "[i]n the event that the [Financial Industry Regulatory Authority ("FINRA")] refuses to arbitrate the Claim," and New York Life does not assert that this antecedent condition is met in this case. See id. at 6-7. Thus, for our purposes, the Employment Agreement incorporates only the FINRA rules and not the NRRED, and nothing in the FINRA rules

- 34 -

purports to speak to the delegation question that we are facing. See id. For that reason, the Employment Agreement's reference to the NRRED does not indicate that a separate and broader delegation provision that would encompass the scope question is operative for our purposes. And, of course, the fact that the NRRED contemplate that such a broader delegation provision would be operative if a condition that has not been satisfied were satisfied cannot itself expand the scope of the only delegation clause that otherwise is in place.

The majority also invokes the Employment Agreement's survival provision to support its construction of the delegation clause. See id. at 18. But, here, too, I do not see how this provision is of help, as that provision is just as consistent with my construction of the delegation clause as it is with the majority's.

The survival provision states that the arbitration agreement and delegation clause "shall survive termination of this . . . Employment Agreement by either party for any reason." It thus ensures that the arbitration that the parties have agreed to conduct -- whether with respect to the merits of a legal claim or its arbitrability -- remains the required process for them to use even after the Employment Agreement is terminated with respect to those "dispute[s], claim[s] or controvers[ies]" that the arbitral provisions encompass. But, the survival provision does

- 35 -

not purport to address the scope of those arbitral provisions. It simply ensures that any dispute within their scope is still subject to arbitration after the Employment Agreement has terminated.

Thus, per the survival provision, the arbitration agreement and delegation clause would bind Bossé in a lawsuit in which he sought recovery for racial discrimination that he alleged he suffered while he was still a Partner but that he brought only after he had left New York Life's employ. And the same is true if he sought to challenge the enforceability of the arbitration agreement as to that suit on the ground of unconscionability. For, there is no question that such an employment-related suit and such a dispute about its arbitrability would fall within the scope of both the arbitration agreement and the delegation clause, and the survival provision ensures that both that agreement and that clause remain fully operative even once the employment relationship that occasioned the Employment Agreement that contains them has ended. What the survival provision does not do is address whether a suit by Bossé that did not arise out of the employment relationship between him and New York Life -- because it was grounded in alleged misconduct by New York Life that first occurred after he had left New York Life's employ -- would be subject to the delegation clause. Thus, it has no bearing on the issue of the scope of the delegation clause in that regard.

For all these reasons, then, I would construe the delegation clause to mean just what it plainly says. And, thus, I would read it to delegate only issues of arbitrability about "such Claim" and not issues concerning what "Claim" means. Accordingly, I conclude that the interpretive dispute before us -- which regards the scope of the term "Claim" in the arbitration agreement -- is an interpretive dispute that the parties have left to a court and not an arbitrator to resolve.[17]

**II.**

Turning, then, to that dispute: Is Bossé's claim that he was discriminated against based on his race in his role as an independent contractor for New York Life -- and thus only after he was no longer employed by the company -- a "Claim" within the meaning of the arbitration agreement? I do not think it is, even presuming a broad construction of the arbitration agreement. See Granite Rock Co. v. Int'l Brotherhood of Teamsters, 561 U.S. 287, 302 (2010).

---

[17] Because I conclude that the delegation clause is plainly narrower than the majority reads it to be, I do not address here whether the "clear and unmistakable" requirement that pertains to the interpretation of delegation clauses means that we must construe delegation clauses that clearly and unmistakably exist narrowly insofar as they are ambiguous as to their scope. Henry Schein, 139 S. Ct. at 530 (quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)). Nor do I understand New York Life to argue in support of such a position, despite the fact that it is the appellant, and so I would wait to address that interpretive question until we have the adversary briefing on it that we have not yet had.

- 37 -

New York Life itself concedes that the parties to the Employment Agreement could not reasonably be thought to have contemplated that the arbitration agreement would encompass even a lawsuit between them that involved an injury that Bossé suffered as a result of being hit by a New York Life vehicle only decades after he had stopped being a "Partner" or even a New York Life employee. Such a suit would not merely be accruing late. It would not arise from their employment relationship at all.

For that reason, there is force in my view to the District Court's observation that we ought to be wary of reading the arbitration agreement in the Employment Agreement to be so disconnected from the employment relationship that brought it about that it may be read to encompass literally "any . . . claim" (emphasis added) -- as those terms appear in a dictionary -- and thus even such a late-occurring traffic accident. See PaineWebber Inc. v. Elahi, 87 F.3d 589, 600 (1st Cir. 1996) (construing contractual terms in the context of the entire agreement). As the District Court observed, and as New York Life apparently agrees, "a reasonable person signing the [Employment] Agreement would hardly think that a slip and fall injury suffered by [the] plaintiff on New York Life property 30 years in the future, and 25 years after any work or other relationship terminated, would be subject to arbitration under that particular [arbitration] clause." Bossé v. N.Y. Life Ins. Co., No. 19-cv-016-SM, 2019 WL

- 38 -

5967204, at *4 (D.N.H. Nov. 13, 2019); see also Smith v. Steinkamp, 318 F.3d 775, 777-78 (7th Cir. 2003) (Posner, J.) (rejecting a reading of an arbitration clause in a loan agreement that would apply to other loan agreements to which the parties subsequently agreed because such a reading contained no "limiting principle" and would therefore lead to "absurd results," such as the conclusion that the parties had agreed to arbitrate any future claim stemming from the borrower's hypothetical murder at the hands of the lender).

Of course, if the text of the arbitration agreement were plainly all-encompassing and thus irreconcilable with the more modest intention of the parties just described, then we would face the unenviable task of squaring the two. But, fortunately, the text of the Employment Agreement is comfortably read to spare us that exercise, as it readily supports a construction of the scope of the arbitration agreement that excludes disputes that even the party arguing for the broadest construction concedes could not have been intended.

Notably, and contrary to New York Life's assertion, the Employment Agreement does not define "Claim" in the arbitration agreement broadly to encompass "'any dispute, claim or controversy arising between' Mr. Bossé and New York Life." (emphasis shifted). It refers instead to only disputes, claims, and controversies that "aris[e] between" "[t]he Partner and New York Life." (emphasis

added).  That is significant, in my view, because Bossé was not a "Partner" when the alleged misconduct by New York Life that grounds his lawsuit against that company is claimed to have first occurred.  Rather, Bossé contends that he was an independent contractor -- and so not an employee of New York Life at all -- at the time of the actionable legal conduct by that company for which he seeks recompense.  In other words, his suit no more "aris[es]" out of an employment relationship with New York Life than do the hypothetical traffic accident and slip-and-fall suits that New York Life itself acknowledges were beyond the contemplation of the contracting parties precisely because they plainly do not arise out of that relationship.

To be sure, Bossé is the "Partner" to whom the contract means to refer.  But, given that the contract is by its terms an "Employment Agreement" between a "Partner" and his employer, and given that the claim for liability at issue here does not concern Bossé's status as either a "Partner" or even an employee of New York Life any more than the hypothetical cases just mentioned do, there is nothing strange in concluding that Bossé's claim for liability arising solely out of that alleged post-employment mistreatment by New York Life is not a "dispute, claim or

controversy" that has "aris[en] between" "[t]he Partner and New York Life." (emphases added).[18]

This more modest reading of the Employment Agreement's scope also draws support from other aspects of the text. For example, the arbitration agreement singles out as the sole type of "Claim" expressly covered by it one that alleges "employment discrimination (including sexual harassment and age and race discrimination)." (emphasis added). It would be surprising for the parties to have felt the need specifically to clarify that this one species of legal claim for recovery constitutes a "Claim" in the arbitration agreement if New York Life's expansive reading of "Claim" in that agreement were correct. After all, if there were indeed no question that the arbitration agreement encompasses "any" legal claim for recovery no matter its connection to the employment relationship between the contracting parties, then there would be no need to clarify that the arbitration agreement also encompasses employment-related claims for recovery that

---

[18] Of course, the delegation clause also sets forth an agreement between the Partner and New York Life to arbitrate the arbitrability of "the Claim," and it surely contemplates that the arbitration of those disputes regarding arbitrability will arise at a time when the Partner is no longer employed by that company. But, precisely because those disputes will concern the arbitrability of "the Claim," they will also necessarily be tied to the employment relationship on the reading of "the Claim" that I embrace.

concern discrimination, as such claims would hardly be at the edges of what "the Claim" would cover.

By contrast, the specific reference to "employment discrimination" claims in the arbitration agreement is much less surprising if the contracting parties understood themselves to have been agreeing to arbitrate only legal claims for recovery by one against the other arising from their employment relationship. On that understanding, it makes sense that they would have wished to make clear that legal claims for recovery pertaining to discrimination arising out of that employment relationship would still be subject to arbitration, given that, unlike many types of employment-related claims for recovery, those seeking recovery for discrimination against a protected class are often statutorily based and so might raise a question as to whether they, too, were to be arbitrated like legal claims for recovery that are premised only on the breach of the Employment Agreement itself.

Moreover, this more modest reading of "Claim" in the arbitration agreement -- which construes that word to be limited by the employment context that gave rise to the Employment Agreement -- accords with the provision in the Employment Agreement that provides that "[i]n the event that the [FINRA] refuses to arbitrate the Claim, . . . the Claim . . . shall be resolved by an arbitration proceeding administered by the [AAA] in accordance with its National Rules for the Resolution of Employment Disputes."

(emphasis added).  At the time at which the parties entered into the Employment Agreement, the NRRED characterized the "[t]ypes of [d]isputes" they "[c]overed" by stating that "[t]he dispute resolution procedures . . . can be inserted into an employee personnel manual, an employment application of an individual employment agreement, or can be used for a specific dispute."  Am. Arb. Ass'n, National Rules for the Resolution of Employment Disputes 7 (2004), https://www.adr.org/sites/default/files/ National%20Rules%20for%20the%20Resolution%20of%20Employment%20Di sputes%20Jan%2001%2C%202004.pdf (emphases added).  And, the NRRED further provided that "[t]hese rules have been developed for employers and employees who wish to use a private alternative to resolve their disputes."  Id. at 3 (emphases added).  In fact, at the time at which the parties entered into the Employment Agreement, the NRRED made no reference to independent contractors, even though subsequent versions of those rules expanded their scope to apply to independent contractor agreements.  See Am. Arb. Ass'n, Employment Arbitration Rules and Mediation Procedures 9 (2009), https://www.adr.org/sites/default/files/EmploymentRules_Web2119. pdf.

I do realize that New York Life puts much weight on the Employment Agreement's inclusion of the survival provision in pressing for its all-encompassing reading of the arbitration agreement.  But, just as the survival provision -- contrary to the

majority's contention -- does not cut against the more limited construction of the delegation clause that I embrace, it also does not cut against the more limited reading of the arbitration agreement's scope.

The survival provision ensures that arbitration remains the required process for adjudicating "Claim[s]" that arise even after the Employment Agreement is terminated. But, as I have explained, claims arising out of the employment relationship between Bossé and New York Life could accrue or be brought after the termination of that relationship, for instance because they might concern the termination itself, involve late-discovered evidence, or simply have been brought post termination. Thus, the inclusion of the survival provision tells us nothing about the scope of "the Claim" in the arbitration agreement, as it concerns only questions of timing regarding the class of suits that "the Claim" encompasses. Thus, the survival provision continues to perform a perfectly useful clarifying function even under the more limited reading of the arbitration agreement's scope that the District Court adopted.

I recognize as well that New York Life advances the contention that, even if the hypothetical slip-and-fall and car-accident suits noted above might lie outside the contemplation of the parties to the Employment Agreement, the legal claim for recovery at hand -- which concerns alleged mistreatment of Bossé

in his role as an independent contractor for New York Life -- is somehow different.  New York Life suggests that such a claim is more tethered to the employment relationship that gave birth to the Employment Agreement, because employees often become independent contractors for the company.  And, on that basis, New York Life contends that such a claim should be understood to fall within the arbitration agreement's scope even if those other less work-related claims should not.

But, I cannot see any way to read the arbitration agreement to permit us to engage in such sorting among what, in the end, are all non-employment-based legal claims for recovery.  For the reasons I have given, I can see a textual basis for construing the arbitration agreement to exclude from its scope suits that arise from conduct by New York Life toward Bossé that only occurred after he was no longer a Partner of New York Life.  I can see no similar textual basis, however, for construing the arbitration agreement such that it would cover some such suits, including this one seeking recovery for race discrimination, and not others, such as one stemming from the hypothesized late-occurring slip-and-fall or traffic accident.  The word "Claim" may not be self-defining, but it is simply not capable of being read to encompass the former suit but not the latter two without importing into that word some hazy standard of relatedness that is fine for parties to ask courts to apply but that is hardly one

that a court should try to conjure for them post hoc. See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991-92 (1st Cir. 1988) (calling on courts "no[t] . . . to rewrite contracts freely entered into between sophisticated business entities" (quoting RCI Ne. Servs. Div. v. Bos. Edison Co., 822 F.2d 199, 205 (1st Cir. 1987))).

Thus, given how unlikely it would be that -- as New York Life readily concedes -- the parties to this employment contract would have agreed to arbitrate any and all lawsuits between them no matter what the parties' relationship was when the conduct giving rise to the future lawsuit first occurred, I, like the District Court, would construe the parties' handiwork in a manner that would ensure that their arbitration agreement remains tethered to the employment relationship that occasioned its signing.[19]

---

[19] I note that Bossé also contends and the District Court held that Section 2 of the Federal Arbitration Act ("FAA") supports the conclusion that the Employment Agreement may not be construed to require arbitration of all legal claims for recovery between the parties, rather than of only employment-related ones. See Bossé, 2019 WL 5967204, at *5. That Section provides that the FAA applies to any "contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction." 9 U.S.C. § 2 (emphasis added). Bossé argues, and the District Court agreed, that his suit alleging race discrimination did not arise out of his Employment Agreement with New York Life because it arose instead out of their subsequent contractual relationship once Bossé had become an independent contractor for New York Life. See Bossé, 2019 WL 5967204, at *5.

The Supreme Court has made clear that the Federal Arbitration Act reflects a policy in favor of arbitration. See, e.g., <u>Granite Rock</u>, 561 U.S. at 302. But, courts have rightly stayed true to the usual principles of contractual interpretation even when construing arbitration agreements. See, e.g., <u>Smith</u>, 318 F.3d at 777-78; <u>Bogen Commc'ns, Inc.</u> v. <u>Tri-Signal Integration, Inc.</u>, 227 F. App'x 159, 160-62 (3d Cir. 2007). Following their sensible approach in construing the arbitral provisions at hand, I conclude that the District Court correctly interpreted the

---

Because Bossé's argument is limited to the interpretive import of Section 2 for construing the scope of the arbitration agreement, we have no occasion to decide whether a federal court could properly consider New York Life's motion to compel arbitration under the FAA if Bossé's suit alleging race discrimination failed to constitute a "controversy" as defined by Section 2. And, because I agree with the District Court's reading of the scope of the arbitration agreement for reasons unrelated to Bossé's argument about the influence that Section 2 might be thought properly to exert on our construction of the scope of that agreement, I see no reason to address Bossé's Section 2 argument here. I do note, though, that it is hard for me to see how the arbitration agreement -- as opposed to the delegation clause -- could be read to fall within Section 2 (at least with respect to the arbitration agreement's full scope) if it did encompass Bossé's suit, given that his suit concerns conduct by New York Life that only occurred when they were no longer in the employment relationship that occasioned the Employment Agreement that contains the agreement to arbitrate. And I note as well that, while the majority finds no Section 2 problem here, I understand its analysis of Section 2 to be limited to that provision's bearing on the proper construction of the delegation clause and so not to address the relationship between Section 2 and the arbitration agreement itself or any other issue relating to that provision.

arbitration agreement in this case.  Accordingly, I respectfully

dissent.